**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**November 10, 2022**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

—————————————————

BRANDON FRESQUEZ,

    Plaintiff - Appellee,

v.

    No. 21-1118

BNSF RAILWAY CO.,

    Defendant - Appellant.

—————————————————

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:17-CV-00844-WJM-SKC)**

—————————————————

Bryan P. Neal, Holland & Knight LLP, Dallas, Texas (Keith M. Goman, Hall & Evans, LLC, Denver, Colorado, with him on the briefs), appearing for Appellant.

Adam W. Hansen, Apollo Law LLC, Minneapolis, Minnesota (Nicholas D. Thompson, Casey Jones Law, Appleton, Wisconsin, Jonathan L. Stone, Moody Law Firm, Portsmouth, Virginia, Eleanor E. Frisch, Apollo Law LLC, Minneapolis, Minnesota, and Colin R. Reeves, Apollo Law LLC, Brooklyn, New York, with him on the brief), appearing for Appellee.

—————————————————

Before **TYMKOVICH**, **BRISCOE**, and **PHILLIPS**, Circuit Judges.

—————————————————

**BRISCOE**, Circuit Judge.

—————————————————

# Table of Contents

*Introduction* ......................................................................................................... 4

I.      *Factual background* ....................................................................................... 5

II.     *Procedural background*................................................................................ 17

III.    *Analysis*....................................................................................................... 21

    A. *Is BNSF entitled to judgment as a matter of law on the merits of Fresquez's claims because he failed to prove that he engaged in any actionable protected activity and/or because BNSF proved its same-decision defense?* .................................... 21
        1. *Standard of review* ....................................................................................22

        2. *The evidentiary burdens in an FRSA case* ..........................................22

        3. *Did Fresquez prove he engaged in actionable protected activity?* ..................24

        4. *BNSF's remaining arguments*................................................................35

        5. *BNSF's same-decision defense* ............................................................44

    B. *Is BNSF entitled to a new trial due to the district court's admission of character evidence and/or other allegedly prejudicial evidence?*........................................51
        1) *Standard of review* ....................................................................................52

        2) *Procedural history of the issue* ................................................................53

        3) *Analysis* ....................................................................................................56

    C. *Did the district court err in denying BNSF's combined request for a new trial on the issue of compensatory damages or, in the alternative, a remittitur of compensatory damages?* .........................................................................................59
        1) *Standard of review* ....................................................................................59

        2) *Procedural history of the issue* ................................................................60

        3) *Analysis* ....................................................................................................65

    D. *Is BNSF entitled to judgment as a matter of law as to punitive damages?*............67
        1) *Standard of review and applicable law* .......................................................67

2) *Procedural history of the issue* ........................................................... 68

3) *Analysis* ........................................................................................... 70

E. *Did the district court err in awarding Fresquez ten years' worth of front pay?* ... 72

1) *Standard of review* .......................................................................... 72

2) *Procedural history of the issue* ........................................................... 73

3) *Failure to distinguish between front pay and damages for loss of future earnings capacity* ............................................................................... 76

4) *The amount of the front pay award* ..................................................... 79

IV. *Affirmance of judgment of district court* ...................................................... 84

*Introduction*

Plaintiff Brandon Fresquez filed this action against his former employer, defendant BNSF Railway Company (BNSF), claiming that BNSF violated the Federal Railroad Safety Act (FRSA) by terminating his employment in retaliation for him engaging in certain activities that are expressly protected under the FRSA. The case proceeded to a jury trial. The jury found in favor of Fresquez on his claim of retaliation under the FRSA, and it awarded him $800,000 in compensatory damages and $250,000 in punitive damages. Following the trial, Fresquez moved for an award of back and front pay. The district court granted that motion in part and awarded Fresquez a total of $696,173 in back and front pay, bringing the total judgment to $1,746,173, plus interest from the date of entry of judgment.

BNSF now appeals. BNSF argues that it is entitled to judgment as a matter of law on the merits of Fresquez's claims, and, alternatively, judgment as a matter of law on the issue of punitive damages. BNSF further argues that it is entitled to a new trial on the merits of Fresquez's claims based on the district court's admission of character and other prejudicial evidence. BNSF also argues that it is entitled to a new trial on the issue of compensatory damages. Lastly, BNSF argues that the district court abused its discretion by awarding Fresquez ten years' worth of front pay.

Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we reject BNSF's arguments and affirm the district court's judgment.

4

## I.     Factual background[1]

BNSF is a Texas-based freight transportation company that operates an extensive interstate railroad network.  BNSF is designated as a Class I freight railroad by the federal government.

Fresquez, a Colorado resident, began working for BNSF's Maintenance of Way Department in November 2005.  Between 2006 and May 2016, Fresquez worked primarily as a track inspector.  The track inspector position requires extensive training, including a week-long community college class, and regular certification testing.

A track inspector's job is to identify and report track defects, which are deviations from BNSF's or the Federal Railroad Administration's (FRA) track safety standards.  FRA regulations set forth a specific schedule for track inspections.  49 C.F.R. § 213.233(c).  Fresquez monitored and inspected the railroad tracks in his assigned geographic area, which covered in part the Denver metropolitan area, to make sure they complied with BNSF and FRA standards.

When a track inspector discovers a track defect, he or she must take one of three remedial actions, depending on the severity and classification of the defect.  Some types of track defects require the inspector to take the track out of service immediately, which means that the track cannot be used until the defect is repaired.  Other types of defects, in

---

[1] Because the jury found in favor of Fresquez on his FRSA claim, we recount the facts that were presented to the jury in the light most favorable to Fresquez.  *See Tudor v. Se. Okla. Univ.*, 13 F.4th 1019, 1025 n.1 (10th Cir. 2021).

contrast, require only that the maximum speed limit be lowered on the section of track containing the defect until such time as the defect is repaired. This type of remedial action applies, in part, to what are known as class-specific defects. A section of track containing a class-specific defect may also be "reclassified to the next lowest class of track for which it does meet all of the [regulatory] requirements" and, if so, will permanently operate at a lower range of speeds unless and until the identified defect is repaired and the section of track is reclassified into a higher class. *See* 49 C.F.R. § 213.9(b). Lastly, defects that are characterized as non-class specific do not require any immediate remedial action, but must be repaired within thirty days. If a non-class specific defect is not repaired within thirty days, the section of track on which it is located must be taken out of service until the defect is repaired.

During the time that Fresquez worked as a track inspector for BNSF, track defects were reported by inputting information about the defect into an electronic track inspection database that BNSF maintained and referred to as the Track Inspection Management System (TIMS). More specifically, a track inspector would enter an identified defect into the TIMS system by entering the milepost location of the defect, selecting the type of defect involved, and then entering information about the type of repair that was required. Track inspectors and their supervisors accessed and worked with information in the TIMS system on a daily basis.

Fresquez, in his role as a track inspector, reported directly to a roadmaster named Michael Paz. Paz in turn reported directly to a division engineer named Mark Carpenter.

BNSF used engineering scorecards to rank its management employees, including division engineers and roadmasters. One part of the engineering scorecards focused on velocity, or the speed of trains across a manager's territory. Speed restrictions that were imposed on sections of track, such as those imposed due to the existence of track defects, could negatively affect this part of an engineering scorecard and, in turn, negatively impact a manager's ranking. Carpenter viewed the engineering scorecards as important and emphasized them to the managers who worked under him.

It is essentially undisputed that Carpenter interpreted the FRA's regulations regarding non-class specific defects in a manner that was contrary to the FRA's published compliance manual. Specifically, Carpenter took the position that tracks containing non-class specific defects could remain in service even if the defects had not been repaired within thirty days after identification. Notably, however, Carpenter never asked BNSF's in-house attorneys to assist him in interpreting the regulation, nor did Carpenter ever contact the FRA to verify if his interpretation was correct. Nevertheless, Carpenter conveyed his interpretation to all of the management employees who worked for him, including Paz.

Beginning in 2014 or 2015, Fresquez became suspicious that Carpenter and Paz were treating non-class specific defects in a manner different than required by the FRA regulations. Specifically, Fresquez began noticing isolated incidents of track defects that he knew had been identified in the field but did not appear in the TIMS system. This

7

caused Fresquez to suspect that management employees such as Carpenter and Paz were removing identified track defects from the TIMS system.

Around this same time, Fresquez identified a defect on a petroleum track in Denver. Fresquez called Paz and asked him to come out to the location of the defect. Paz agreed with Fresquez that a defect existed and told Fresquez that he had done a good job. Paz in turn notified the employee in charge of the track that the defect needed to be repaired. Shortly thereafter, however, Paz was called to Carpenter's office. When Paz returned to the site of the defect, he told Fresquez, "I'm here to tell you from Mark Carpenter . . . if that defect is in the [TIMS] system tonight, you will be wrote [sic] up for insubordination." Aplt. App., Vol. VI at 1434.

Following that incident, Carpenter decided one day to accompany Fresquez on his route in order to inspect the defects that Fresquez had identified. When Fresquez and Carpenter arrived at one of the first defects, Carpenter belittled Fresquez and told him to remove the defect from the TIMS system because Fresquez had marked it 200 feet short of the actual location. Carpenter subsequently told Fresquez to remove "a couple other defects" from the TIMS system. *Id.* at 1436. Although doing so violated federal law, Fresquez did as Carpenter directed because he was scared of losing his job and the medical benefits that came with the job. The experience, however, "started a war within" Fresquez because he believed he was violating federal law by removing the defects from the TIMS system. *Id.* at 1438.

8

On April 29, 2015, Fresquez was at work and notified Ryan Akers, another roadmaster who worked under Carpenter, that he was going to take Track 533 out of service because it contained a defect. Track 533 was a track that received regular daily traffic because it was used to transport grain and automobiles. Akers responded by telling Fresquez that if he wanted to continue receiving a paycheck, he would inspect the track again and report that it showed no defects. Fresquez said to Akers, "You know what you are telling me to do. You are telling me to falsify reports." *Id*. at 1440. Akers responded by kicking Fresquez out of his office. Fresquez contacted his union representative and informed her of the incident. According to Fresquez, he later checked the TIMS system and determined that the defect had been removed from the system. Upon further investigation, Fresquez learned that Akers had instructed BNSF's information technology department to remove the defect, as well as approximately thirty-four other defects, from the TIMS system.

Shortly thereafter, Fresquez confronted Carpenter at a group safety briefing about the removal of defects from the TIMS system. Carpenter responded by moving Fresquez from the room where the safety briefing was occurring, taking him to a separate office, and belittling him. According to Fresquez, Carpenter told him that it was not his job to take tracks out of service or to find defects, and that his only job was to write reports. Carpenter also allegedly told Fresquez that he was a bad inspector and that Carpenter would either fire or disqualify him if he continued to find track defects. Fresquez asked for union representation several times during the incident with Carpenter, but Carpenter

9

allegedly told Fresquez to never call the union again. Throughout the incident, Carpenter repeatedly told Fresquez to not "report defects that are going to stop traffic, that are going to take a lot of hours to fix." *Id*. at 1461.

Following this incident with Carpenter, Fresquez transferred to a foreman flagman position, which was the first vacant position at BNSF that he could transfer to based on his seniority.[2] The foreman flagman position did not require Fresquez to report defects. No discipline issue arose while Fresquez worked in this position. In February 2016, however, another BNSF employee with greater seniority took the foreman flagman job from Fresquez. This meant that Fresquez had to return to the track inspector position in Denver that he previously held. Because Fresquez was certified as a track inspector, he was not, according to BNSF's own policies, eligible to work in a lower position such as laborer or trackman.

In March 2016, Fresquez found a defect in a track located by the stockyards in Denver. Fresquez notified Paz of the defect and Paz immediately traveled to the site of the defect. Although Fresquez had previously placed an order limiting the speed on the track to no more than ten miles per hour, Paz removed that order and placed the track back at the maximum authorized speed. According to Fresquez, Paz's action violated federal regulations.

---

[2] Every two weeks BNSF issued a list of vacant jobs and BNSF employees could "put in" for those positions. Aplt. App., Vol. VI at 1468. The applicant with the most seniority received the position.

After this incident, Fresquez transferred again to an open foreman flagman position. Fresquez, however, was only able to work in that foreman flagman position until May 2, 2016, when another BNSF employee with seniority displaced him. At that point, Fresquez had to again return to the track inspector position.

On May 2, 2016, which was Fresquez's first day back working as a track inspector, Paz told him "not to do anything so [Paz] could get his house in order." *Id*. at 1479. Fresquez responded to Paz's statement by driving around the rest of the day and not inspecting any tracks.

On May 3, 2016, Fresquez began inspecting tracks and found a severe defect. Fresquez texted Paz and informed him of the defect. According to Fresquez, this severe defect had existed for several months and should have been, but was not, repaired in March or April of 2016. Fresquez determined that Paz had entered information into the TIMS system falsely indicating that this severe defect had been repaired. Fresquez confronted Paz about this information in the TIMS system and said "I know what happened to my defects." *Id*. at 1482. Paz allegedly laughed at Fresquez in response.

On May 4, 2016, Fresquez texted Paz and told him that he had taken a section of track out of service due to the existence of a defect. The section of track was located in downtown Denver and was considered an important track because it was situated near an amusement park and an arena. Paz texted Fresquez back and said "that pulling tracks [out of service] doesn't make friends." *Id*. at 1484.

On May 5, 2016, Fresquez discovered a track defect, specifically a broken tie located on a curved section of track, that he had previously identified in February 2016. When he first identified this defect in February 2016, Fresquez wanted to place a ten-mile-per-hour limit on the section of track containing the defect, but Paz decided to treat it as a non-class specific defect, which meant that trains could continue to run at regular speed over the track for a period of thirty days. When Fresquez rediscovered the defect on May 5, 2016, he concluded that the track needed to be taken out of service until it was repaired. Paz, however, wanted Fresquez to reclassify the defect as a class-specific defect so that trains could continue to run over the track containing the defect. Fresquez told Paz he was going to "call [his] friends in high places," meaning he was going to call the FRA. *Id*. at 1489.

After concluding the conversation with Paz, Fresquez called an FRA agent he knew and described what had occurred regarding the defect. The FRA agent confirmed that Fresquez was correct regarding how the defect should be handled and that Fresquez could not reclassify the defect as Paz wanted him to do. After talking to the FRA agent, Fresquez called Paz and they negotiated to fix the defect at issue. During the conversation, Fresquez said to Paz, "Admit that you are falsifying reports, the defects." *Id*. at 1491. Paz allegedly admitted to doing so, and then stated, "We'll work on it," and "We have to find a happy meeting place." *Id*. Paz also stated that he had Carpenter on his side and that "they don't lose." *Id*. at 1492. Fresquez interpreted this statement to mean that Carpenter and Paz were going to continue the practice of handling defects in a

12

manner inconsistent with federal regulations.  Lastly, Paz told Fresquez during the call,

"I'll . . . walk behind you and find 8 missing [rail] clips and fire you." *Id*.  Fresquez

understood this to mean that Paz would follow him while on duty, wait until he observed

Fresquez violating a rule, and then fire him.

On May 5, 2016, Fresquez discovered another defect that he had identified in

February 2016, but had not been repaired and had been removed from the TIMS system.

Under the FRA's regulations, this defect required Fresquez to reduce the maximum speed

on the section of track containing the defect.  Fresquez called the dispatcher and told him

what action he was taking with regard to the track.  Approximately twenty minutes after

placing the slow order on the track, Fresquez received a call from Paz directing him to

meet at the site of the defect.  Fresquez and Paz then met at the site of the defect.  Also

present on-site was Jay Herzog, a BNSF foreman, and Herzog's repair crew.

Paz stated that he did not see the defect that Fresquez had identified.  Fresquez

stated in response that the defect was not the type that could be observed and instead had

to be measured.   Paz said to Fresquez, "I do not have to prove . . . the defect's not there.

It's your job to prove the defect is there." *Id*., Vol. X at 2630–31.  According to

Fresquez, Paz then twice stated to him, "Do you want to string-line the defect?"[3]  *Id*.,

Vol. VI at 1540.  Fresquez interpreted Paz's statements as questions rather than

---

[3] A string line is a hand tool commonly used in construction to help the user create a straight line between two reference points.

13

directions. Fresquez also believed that Paz was setting him up and intended to falsify information regarding the existence of the defect. Based upon that belief, and because he was concerned about being fined by the FRA or held responsible by Carpenter if the defect resulted in an accident, Fresquez did not measure the defect and instead got into his truck, drove approximately 200 feet away, and parked next to Herzog's crew, who were preparing to fix some other track defects.

Paz called Fresquez on his radio and again asked him if he wanted to string-line the defect. Fresquez said to Paz, "I don't see the point. You have already made your decision." *Id*. at 1509. According to Fresquez, this statement meant that he believed that Paz had already decided to falsify the report regarding the defect. Paz responded by saying, "I take that as a no." *Id*. Fresquez replied, "I didn't say no." *Id*.

Fresquez returned to the site of the defect and observed Paz and Herzog measuring the defect with a string line. Fresquez asked if the two men needed help. *Id*. Paz said "no, we'll have time to argue the facts later." *Id*. at 1510. Fresquez then asked Herzog if the defect was present and Herzog said yes. *Id*. at 1511.

Following this incident, information was entered into the TIMS system falsely indicating that the defect identified by Fresquez and verified by Paz and Herzog's measurements had been repaired that same day (May 5, 2016). It is undisputed that neither Fresquez nor Herzog entered this information and, in fact, lacked the ability to do so. Carpenter later conceded that the only person who could have entered this

14

information was Paz. Repairing the defect would have required shutting down up to three separate tracks in a high-traffic location.

Paz immediately reported the string-line incident to Carpenter, who instructed Paz to prepare a written notice of investigation. Paz did so and then messaged Fresquez and instructed him to report to Paz's office. When Fresquez arrived at Paz's office, Paz handed him the notice of investigation. The notice of investigation effectively alleged that Fresquez had violated BNSF's progressive disciplinary policy and was subject to either discipline or dismissal.

BNSF's progressive disciplinary policy was called the Policy for Employee Performance and Accountability (PEPA). PEPA applied to all of BNSF's scheduled (i.e., union) employees, including track inspectors such as Fresquez. PEPA listed three categories of rules violations: standard, serious, and stand-alone dismissible. The charge alleged against Fresquez in the notice of investigation, insubordination, was classified under PEPA as a stand-alone dismissible offense.

Under the collective bargaining agreement between Fresquez's union and BNSF that was in place at the time, any employee who had worked for more than sixty days for BNSF could not be disciplined or dismissed from employment until they were afforded an investigation hearing. Investigation hearings were conducted by a member of BNSF's management. The charged employee was not permitted to be represented at the hearing by an attorney, but could have a union representative present with them. BNSF paid the

15

employees that it selected to testify at the hearing, but it did not pay any employees that were selected to testify by the charged employee.

In Fresquez's case, an investigation hearing was held regarding the allegation of insubordination that Paz made against him. The hearing was conducted by Everett Percival, a BNSF management employee. Paz was the only witness to testify against Fresquez. Prior to the hearing, Carpenter sent an email to Paz giving him detailed instructions on how to testify at the hearing. The email included specific directions on what to say when the hearing officer asked Paz what happened. For example, Carpenter instructed Paz to say: "Employee refused to get tools and measure repaired track defect when instructed to do so." *Id.*, Vol. VII at 1652. Carpenter also told Paz to "be firm about your instructions being clear and direct, not light and optional." *Id*. During the hearing, Paz, consistent with the instructions from Carpenter, testified that he told Fresquez three times to remeasure the defect. Paz also testified during the hearing that he determined that no defect was present.

The transcript of the investigation hearing was then sent to BNSF's PEPA team. The PEPA team was comprised of employees who worked for BNSF's Labor Relations Department. A member of the PEPA team, Stephanie Detlefsen, reviewed the hearing transcript and concluded that the evidence supported a charge of insubordination. Based upon this conclusion, Detlefsen recommended that Fresquez be terminated from his employment with BNSF.

16

Detlefsen's recommendation was reviewed by Adam Miller, who at the time served as the General Director of Line Maintenance for BNSF's Powder River Division and, in that role, acted as Carpenter's direct supervisor. Miller decided to terminate Fresquez for insubordination because "[h]e refused instruction from his supervisor."[4] *Id.*, Vol. IX at 2377. BNSF, acting on Miller's decision, formally terminated Fresquez from his employment on May 27, 2016.

## II.   *Procedural background*

On April 5, 2017, Fresquez filed this action against BNSF alleging that BNSF violated the FRSA by terminating his employment in retaliation for engaging in protected activities under the FRSA.[5] Specifically, Fresquez alleged that BNSF violated 42 U.S.C. § 20109(a)(1), (a)(2), and (b)(1)(A). Fresquez's complaint sought relief in the form of reinstatement to his position, expungement of any record of his alleged insubordination, compensatory damages, damages for emotional distress, punitive damages, and costs and fees.

The case proceeded to a six-day jury trial in February 2019. At the conclusion of all the evidence, BNSF moved for judgment as a matter of law. The district court granted

---

[4] It is undisputed that a failure to follow a supervisor's instruction is not considered by BNSF to be a stand-alone dismissible violation. It is also undisputed that classifying a particular incident as insubordination or failure to follow a supervisor's instruction is often subjective.

[5] Before initiating these federal court proceedings, Fresquez filed a complaint with the Occupational Safety and Health Administration. *See* 49 U.S.C. § 20109(d)(1).

in part and denied in part BNSF's motion.  The district court "conclude[d] that the only

protected activity that could be a contributing factor to [Fresquez's] termination [wa]s the

May 2016 incident," and it consequently granted judgment as a matter of law in favor of

BNSF with respect to "the 2015 events" cited by Fresquez.  *Id.*, Vol. X at 2490.  But the

district court also "order[ed] that the jury c[ould] consider the . . . 2015 events as

background" evidence.  *Id*.  The district court rejected BNSF's argument that it had

produced clear and convincing evidence that Fresquez would have been terminated from

his employment absent engaging in protected activity under the FRSA.  With respect to

the issue of damages, the district court found that Fresquez "ha[d] introduced sufficient

evidence to submit the issue of emotional damages and punitive damages to the jury."  *Id*.

at 2492.

The jury, after deliberating for approximately three hours, returned a verdict in

favor of Fresquez.  More specifically, the jury found that Fresquez engaged in protected

activity defined by the FRSA, BNSF knew that Fresquez engaged in protected activity,

Fresquez suffered an unfavorable personnel action, and Fresquez's engagement in

protected activity was a contributing factor to the unfavorable personnel action.  The jury

also found that BNSF failed to prove by clear and convincing evidence that it would have

taken the same personnel action against Fresquez even if he had not engaged in any

18

protected activity.[6]  The jury found that Fresquez had proven by a preponderance of the

evidence that he should be awarded compensatory damages for emotional distress, pain,

suffering, inconvenience, or mental anguish, and it found the amount of such damages to

be $800,000.  Lastly, the jury found that Fresquez had proven by a preponderance of the

evidence that BNSF acted with reckless or callous disregard of his right to be free from

retaliation for engaging in protected activity, and it awarded Fresquez $250,000 in

punitive damages.

The jury was not asked to determine back pay or front pay because the district

court determined that those were equitable remedies that it would decide.  After the jury

returned its verdict, the district court encouraged the parties to attempt to reach an

agreement on the issues of back pay and front pay and, if necessary, to request a hearing

on those issues.  The parties were unable to reach an agreement.

Due to the parties' failure to reach an agreement, Fresquez moved for an award of

back pay and front pay.  After holding an evidentiary hearing on the motion, the district

court ultimately granted the motion in part and awarded Fresquez "a total tax-adjusted

---

[6] Due to an error on the original verdict form, the jury originally returned conflicting responses, finding in particular that BNSF had proven by clear and convincing evidence that it would have taken the same personnel action against Fresquez even if he had not engaged in any protected activity.  The district court and the parties agreed that the instructions and verdict form should be corrected and that the jury should be sent back to deliberate.  Upon deliberating the second time, the jury returned the verdicts described herein.  After the jury returned that verdict, BNSF moved for a mistrial, but the district court denied that motion.  BNSF does not challenge that ruling in its appeal.

award of back pay, front pay, and prejudgment interest through December 17, 2019 of

$696,173." *Id.*, Vol. III at 681.  The district court in turn directed the clerk of the district

court to "enter judgment in favor of [Fresquez] . . . in the principal amount of

$1,746,173—comprised of $696,173 for back pay, front pay, and prejudgment interest;

$800,000 in compensatory damages; and $250,000 in punitive damages—with

postjudgment interest at the federal statutory rate." *Id*.

Final judgment in the case was entered on December 17, 2019.

On January 14, 2020, BNSF filed a renewed motion for judgment as a matter of

law, a motion for new trial, and a motion to alter or amend the judgment.  BNSF argued,

in pertinent part, that Fresquez failed to demonstrate that he engaged in protected activity

under the FRSA, that the decisionmakers knew about his alleged protected activity, or

that any protected activity contributed to his termination.  BNSF further argued that it

demonstrated by clear and convincing evidence that it would have fired Fresquez absent

any protected activity (the same-decision defense).  BNSF also argued that it was entitled

to judgment as a matter of law, or a new trial, on the issue of compensatory and punitive

damages.  Finally, in its motion to alter or amend the judgment, BNSF challenged various

aspects of the district court's award of front pay.

On March 8, 2021, the district court issued separate orders denying BNSF's

motions.  The district court also awarded Fresquez $44,910 in attorneys' fees and

$1,341.75 in costs.  *Id*. at 901.

BNSF thereafter filed a timely notice of appeal.

*III. Analysis*

BNSF asserts six issues on appeal.  First, BNSF argues that it is entitled to judgment as a matter of law because Fresquez failed to prove any actionable protected activity.  Second, BNSF argues that it is entitled to judgment as a matter of law because it proved its same-decision defense.  Third, BNSF argues that it is entitled to a new trial based on the district court's erroneous admission of character and other prejudicial evidence.  Fourth, BNSF argues that the district court abused its discretion in denying BNSF's request for a new trial or, in the alternative, a substantial remittitur of the compensatory damages award.  Fifth, BNSF argues that it is entitled to judgment as a matter of law with respect to the issue of punitive damages.  Finally, BNSF argues that the district court abused its discretion by awarding Fresquez ten years' worth of front pay.  As we shall proceed to explain, we find no merit to any of these issues and therefore affirm the judgment of the district court.

A. *Is BNSF entitled to judgment as a matter of law on the merits of Fresquez's claims because he failed to prove that he engaged in any actionable protected activity and/or because BNSF proved its same-decision defense?*

In its first two issues on appeal, BNSF argues that it is entitled to judgment as a matter of law on the merits of Fresquez's FRSA claim because Fresquez failed to prove at trial that he engaged in any actionable protected activity, and, even if Fresquez proved that he engaged in actionable protected activity, BNSF proved its same-decision defense. For the reasons that follow, we reject BNSF's arguments and conclude that BNSF is not entitled to judgment as a matter of law.

21

*1. Standard of review*

We review de novo a district court's denial of a motion for judgment as a matter of law, applying the same standards as the district court. *Bimbo Bakeries USA, Inc. v. Sycamore*, 29 F.4th 630, 640 (10th Cir. 2022). A court may enter judgment as a matter of law only when the nonmovant has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for the nonmovant on that issue. *Id*. In reviewing a district court's denial of a motion for judgment as a matter of law, we draw all reasonable inferences in favor of the nonmoving party, and we will reverse the district court only if the evidence points but one way and is susceptible to no reasonable inferences supporting the nonmovant. *Id*. at 641.

*2. The evidentiary burdens in an FRSA case*

Section 20109 of the FRSA, entitled "Employee protections," provides, in pertinent part, as follows:

(a) **In general**.--A railroad carrier . . . may not . . . discriminate against an employee if such discrimination is due, in whole or in part, to the employee's lawful, good faith act done, or perceived by the employer to have been done or about to be done--

(1) to provide information, directly cause information to be provided, or otherwise directly assist in any investigation regarding any conduct which the employee reasonably believes constitutes a violation of any Federal law, rule, or regulation relating to railroad safety or security . . . , if the information or assistance is provided to or an investigation stemming from the provided information is conducted by--

(A) a Federal, State, or local regulatory or law enforcement agency . . . ;

22

(B) any Member of Congress, any committee of Congress, or the Government Accountability Office; or

(C) a person with supervisory authority over the employee or such other person who has the authority to investigate, discover, or terminate the misconduct;

(2) to refuse to violate or assist in the violation of any Federal law, rule, or regulation related to railroad safety or security . . . .

(b) **Hazardous safety or security conditions**.--(1) A railroad carrier engaged in interstate or foreign commerce, or an officer or employee of such a railroad carrier, shall not discharge, demote, suspend, reprimand, or in any other way discriminate against an employee for--

(A) reporting, in good faith, a hazardous safety or security condition . . . .

49 U.S.C. § 20109(a)(1) and (2), (b)(1)(A).

Section 20109(d) authorizes a railroad "employee who alleges discharge, discipline, or other discrimination in violation of subsection (a) . . . [or] (b)" of § 20109 to file an enforcement action with the Secretary of Labor. *Id*. § 20109(d)(1). An enforcement action that is filed by a railroad employee under § 20109(d)(1) "shall be governed under the rules and procedures set forth in [49 U.S.C. §] 42121(b), including . . . the legal burdens of proof." *Id*. § 20109(d)(2)(A)(i).

Under the burden-shifting framework outlined in § 42121(b), the employee has "the initial burden . . . to establish a prima facie case by showing that (1) the employee engaged in a protected activity [i.e., one of the activities outlined in § 20109(a) or (b)]; (2) the employer knew that the employee engaged in the protected activity; (3) the employee suffered an unfavorable personnel action; and (4) the protected activity was a

23

contributing factor in the unfavorable action." *Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1212 (10th Cir. 2018) (quotation marks omitted). "The absence of probative evidence as to any single element necessary to establish a prima facie claim terminates the action." *Id.* (quotation marks omitted). If the employee establishes a prima facie case, "the burden switches to the employer to demonstrate 'clear and convincing evidence that the employer would have taken the same unfavorable personnel action in the absence of [the employee's protected activity].'" *BNSF Ry. Co. v. U.S. Dep't of Lab.*, 816 F.3d 628, 638 (10th Cir. 2016) (quoting 49 U.S.C. § 42121(b)(2)(B)(iv)).

### 3. Did Fresquez prove he engaged in actionable protected activity?

BNSF argues, in part, that Fresquez's interactions "on his last day of work . . . do not support a showing" that he engaged in "any FRSA protected activity that could support the judgment." Aplt. Br. at 14. That is because, BNSF asserts, "the conduct was not protected at all, the decisionmaker was unaware of it, or the conduct was exclusively governed by a different FRSA section that imposes special requirements that Fresquez admitted he could not satisfy." *Id.*

For us to fully address BNSF's arguments, it is necessary to briefly revisit the procedural history of this case in terms of what protected activity Fresquez alleged, what BNSF alleged in response, and what activity the district court ultimately limited the jury to consider. Prior to and during the course of the trial, Fresquez alleged that he engaged in three types of statutorily-protected activity during 2015 and 2016: (1) he lawfully provided information to the FRA regarding conduct that he reasonably believed

24

constituted a violation of federal laws or regulations relating to railroad safety; (2) he lawfully refused to violate or assist in violating any federal law or regulation relating to railroad safety (by, for example, refusing to reclassify a defect); and (3) he reported to BNSF the existence of a hazardous safety condition.

At the summary judgment stage, BNSF did not dispute that refusing to reclassify a defect was a protected activity. BNSF also did not dispute that Detlefsen and Miller, the two BNSF employees who decided to terminate Fresquez's employment following the investigation hearing, were aware that Fresquez alleged that on May 5, 2016, Paz asked him to reclassify the defect and Fresquez refused to do so.

In the final pretrial order, which was issued after the district court denied BNSF's summary judgment motion, Fresquez alleged that he had "long suspected that" Carpenter "and some of the supervisors under Carpenter were circumventing federal regulations regarding when damaged track needed to be taken out of service or have the speed limit on them reduced." Aplt. App., Vol. I at 64–65. Fresquez in turn alleged that, after he began objecting to this "circumvention of the federal regulations regarding rail safety," Paz instructed him to appear at the site of a defect that Fresquez had identified, "told Fresquez that he could not see the damage, and suggested that his inability to see the damage with his naked eye meant the track did not need to be reported as damaged." *Id*. at 65. "When [he] objected," Fresquez alleged, "Paz responded by asking [him] whether he wanted to re-measure the track to see if the damage was still there, as though there was a chance the rail may have magically fixed itself." *Id*.

25

BNSF, for its part, alleged in the final pretrial order that Fresquez failed to "plead[] the correct protected activity." *Id*. at 69. Specifically, BNSF alleged that the provisions of § 20109(b)(1)(B) and (C) applied to the protected activity alleged by Fresquez, rather than "the more general provisions of [§] 20109(a)(1), (a)(2), and (b)(1)(A)," but that Fresquez "never pleaded a [§] 20109(b)(1)(B) claim." *Id*.

In its renewed motion for judgment as a matter of law filed at the conclusion of all the evidence, BNSF argued, in part, that Fresquez had failed to provide the jury with "a legally sufficient evidentiary basis" to find "either that the BNSF decision-makers knew that he engaged in protected activity under the cited sections of the FRSA, or that BNSF intentionally retaliated against [Fresquez] by terminating him in whole or in part due to his protected activity." *Id*. at 195. In support, BNSF argued, in relevant part:

> Plaintiff next claims that he engaged in protected activity in May of 2016 when he objected to the alleged suggestion of Michael Paz, then his Roadmaster, that a non-class specific defect be changed to a class-specific defect so that it did not need to be taken out of service, and when he contacted the Federal Railroad Administration . . . to confirm that the track should be taken out of service. Initially, while Plaintiff attempts to re-frame these activities as an objection to an illegal activity, what he is really asserting is retaliation for taking a track out of service, which Plaintiff did not plead and disclaimed any intent to rely on.

*Id*. at 202.

> Finally, it appears that Plaintiff is now arguing that he engaged in protected activity when he refused to string-line the track during the insubordination incident. Plaintiff's latest theory is that he wouldn't measure the track because he believed Mr. Paz was going to remove the defect regardless of whether he measured it, and Mr. Paz "'could attach his name to the defect's dangerous and illegal removal from the system.'" [ECF 137 at p.3]. . . . [T]his incident does not demonstrate protected activity as it is not disputed

26

that it was safe to measure the track, and if Plaintiff really believed Mr. Paz
wanted to illegally remove the defect he would have taken the measurement
in the presence of a third party to prove it was there.

*Id*. at 202–03 (citation and footnote omitted).

The district court granted in part and denied in part BNSF's renewed motion for judgment as a matter of law. Specifically, the district court agreed with BNSF that Fresquez failed to "demonstrate[] that his alleged protected activity" in 2015 "contributed to his termination." *Id*., Vol. X at 2485. The district court noted in support that "[t]here [wa]s no evidence that . . . Miller and . . . Detlefsen," the two decisionmakers, "knew of any protected activity in May or June of 2015." *Id*. at 2487. The district court "conclude[d] that the only protected activity that could be a contributing factor to plaintiff's termination [wa]s the . . . incident that occurred on or about May 5th, 2016." *Id*. at 2490. The district court noted that "[t]he May 2016 incident with Paz occurred on the same day plaintiff was removed from work, and there [wa]s evidence to support plaintiff's claim that the conflict with Paz led to his termination." *Id*. The district court "therefore grant[ed] defendant's motion for judgment as a matter of law as to the 2015 events not being protected activity, but den[ied] it as to the May 2016 incident." *Id*. The district court also "order[ed] that the jury c[ould] consider the . . . 2015 events as background." *Id*.

The district court, in its instructions to the jury, noted that "Fresquez allege[d] that BNSF terminated him in retaliation for engaging in activity protected under the Federal

27

Railroad Safety Act, 49 U.S.C. § 20109." *Id.*, Vol. I at 263 (Instruction No. 2). The

district court in turn instructed the jury as follows:

> An employee engages in protected activity as defined by the FRSA if the employee, in good faith, commits an act, or the employer perceives the employee to have committed an act or to be about to commit an act
>   1. to lawfully provide information, directly cause information to be provided, or directly assist in any investigation regarding any conduct which the employee reasonably believes constitutes a violation of any Federal law, rule, or regulation relating to railroad safety if the information is provided to an employee's supervisor or the FRA; or
>   2. to lawfully refuse to violate or assist in violating any Federal law, rule, or regulation relating to railroad safety or security; or
>   3. to report a hazardous safety or security condition.

*Id.* at 277.

As noted, the jury returned a verdict in favor of Fresquez. On the verdict form, the

jury found that: Fresquez had proven by a preponderance of the evidence that he engaged

in a protected activity as defined by the FRSA; BNSF knew Fresquez engaged in the

protected activity; Fresquez suffered an unfavorable personnel action; and the protected

activity was a contributing factor in the unfavorable personnel action.

After the district court entered final judgment in favor of Fresquez, BNSF filed a

written post-trial motion for judgment as a matter of law arguing, in pertinent part, that

Fresquez "did not invoke § 20109(b)(1)(B) or (b)(1)(C) . . . because they are subject to

special, more stringent requirements, set out in § 20109(b)(2)" and his "counsel admitted

he would be unable to prove these latter requirements and expressly disclaimed any intent

to invoke these sections of the FRSA as protected activity." *Id.*, Vol. III at 686 (emphasis

omitted). BNSF in turn argued that the trial court "therefore ruled that [Fresquez's]

28

refusal to work on May 5, 2016" was 'not a protected activity that [he] [wa]s trying to prove'" under §§ 20109(b)(1)(B) or (b)(1)(C) and he thus could not "'argue [that] taking tracks out of service [wa]s a protected activity'" under those sections of the FRSA. *Id.* (quoting Trial Tr., Vol. VI at 1393). Nevertheless, BNSF argued that Fresquez's "claims were in fact premised on taking tracks out of service and refusing to work, and the jury therefore erred in determining [Fresquez] engaged in protected activity within the meaning of the FRSA provisions that were actually invoked." *Id.*

The district court denied BNSF's post-trial motion for judgment as a matter of law. In doing so, the district court stated:

> [A]s [the court] held on summary judgment, Fresquez alleged several activities that are protected activities under the subsections of the statute that he did invoke, including that he "refused to reclassify a defect on May 5." (ECF No. 83 at 11 (citing 49 U.S.C. § 20109(a)(2) (protected activity includes 'refus[ing] to violate the law or assist in the violation of any Federal law, rule or regulation.')).)

> The jury heard Fresquez's testimony that he tried, in his role as a track inspector, to take a track out of service on May 5, 2016 because a track defect originally reported in March 2016 had not been repaired within thirty days, as required by federal regulations. (Trial. Tr. II at 461.) His boss, Michael Paz, tried to get him to report the defect as a slow-order defect, which would allow BNSF to keep the track in service with a reduced speed limit. (*Id.* at 461–63.) Fresquez called the Federal Railroad Administration ("FRA") to verify that BNSF cannot change the nature of a reported defect as it sees fit, which the FRA confirmed. (*Id.* at 462) Thereafter, Fresquez alluded to the fact that he had called the FRA in a conversation with Paz. (*Id.* at 463–64.) In response, Paz told Fresquez that he had Mark Carpenter (his supervisor) on his side and that they do not lose. (*Id.* at 464.) Paz also referenced a different employee who was fired, stating, "I'll pull a Ryan Akers, walk behind you and find 8 missing [rail] clips and fire you." (*Id.*) Fresquez understood this to be a reference to following employees and waiting until they violate a rule to fire them. (*Id.* at 465.)

29

Shortly thereafter, Paz called Fresquez to a location in south Denver to measure an alignment defect in the track that was first found in 2014. (*Id*. at 472.)  When Fresquez arrived at the location, Paz and Jay Herzog were already there. (*Id*. at 473.)  Paz asked Fresquez to measure the defect, even though the alignment defect is not the kind of defect that can be seen with the naked eye. (*Id*. at 475.)  Fresquez believed that Paz was trying to get him to measure the defect and falsely mark the defect as repaired. (*Id*. at 476.)  Fresquez believed that the defect was "going to be removed from the system [no] matter what," but he did not want to participate in falsifying the defect because he could be personally fined. (*Id*. at 476–77.)  Not wanting to participate in Paz's request, which he believed to be a setup, Fresquez left. (*Id*. at 476–78)  When Fresquez later went back to the alignment defect and offered to measure it, he was told it was too late. (*Id*. at 483.)

BNSF argues that Fresquez has not proven a violation of § 20109(a)(2) because "Plaintiff cites no authority for the prospect that changing a non-class[]specific defect to a class-specific defect violates any federal law if it was improperly characterized in the first place, which is what Plaintiff's supervisor asked him to consider." (ECF No. 209 at 6 (citing Trial Tr. III at 696–98).)  However, in drawing all reasonable inferences in favor of Fresquez, a reasonable jury could conclude that: (1) Paz's request to Fresquez on May 5, 2016 to report the defect as a slow-order defect rather than taking the track out of service violated the law; and (2) Fresquez engaged in protected activity by refusing to reclassify the defect. *See Rookaird v. BNSF Ry. Co*., 908 F.3d 451 (9th Cir. 2018) (there was sufficient evidence supporting finding that railroad conductor refused, in good faith, to violate railroad safety rule or regulation even though trainmaster did not explicitly direct conductor to stop performing air-brake test, in light of evidence that trainmaster questioned air-brake test's necessity while conductor and his crew were performing test).

Thus, the Court cannot conclude that the overwhelming weight of the evidence favors BNSF to such an extent that it can find that Fresquez did not engage in protected activity.  The Court therefore denies this portion of BNSF's Rule 50(b) motion.

Aplt. App., Vol. III at 871–73.

Having outlined the relevant procedural history of BNSF's motion, we now turn to the evidence that Fresquez presented at trial that pertains to his engagement in potentially protected activities. Fresquez presented evidence, much of it by way of his own testimony, establishing that the following events occurred on May 5, 2016, the day he was charged with insubordination:

- During the first part of the day, Fresquez discovered a non-class specific defect, specifically a broken tie, that he had previously identified in February 2016. *Id*., Vol. VI at 1486–88. When he first identified the defect in February 2016, Fresquez wanted to place a ten-mile-per-hour limit on the portion of track containing this defect, but Paz preferred to treat it as a class defect, which allowed trains to continue to run at regular speed over the track for a period of thirty days. *Id*. at 1487. On May 5, 2016, Fresquez determined that the defect still existed and had not been repaired, so he concluded that the track needed to be taken out of service. *Id*. at 1488–89. Paz, however, wanted Fresquez to reclassify the defect so that trains could continue to run at full speed over the track containing the defect. *Id*. at 1489. Fresquez told Paz he was going to "call [his] friends in high places," meaning he was going to call the FRA. *Id*. That concluded the conversation regarding the defect. *Id*.

- After concluding the conversation with Paz, Fresquez called an FRA agent he knew and described what had occurred regarding the defect. *Id*. at 1490. The FRA agent confirmed that Fresquez was correct regarding how the defect should be handled and that Fresquez could not reclassify the defect as Paz wanted him to do. *Id*. After talking to the FRA agent, Fresquez called Paz and they negotiated to fix the defect at issue. *Id*. at 1491. During the conversation, Fresquez said to Paz, "Admit that you are falsifying reports, the defects." *Id*. Paz admitted to doing so. *Id*. Paz in turn stated, "We'll work on it," and "We have to find a happy meeting place." *Id*. Paz also stated that he had Carpenter on his side and that "they don't lose." *Id*. at 1492. Fresquez interpreted this statement to mean that Carpenter and Paz were going to continue doing what they had been doing with regard to defects. *Id*. Lastly, Paz told Fresquez during the call, "I'll pull a Ryan Akers, walk behind you and find 8 missing [rail] clips and fire you." *Id*. Fresquez understood this to mean that Paz would

follow him while on duty, wait until he observed Fresquez violating a rule, and then fire him. *Id.* at 1493.

- Following the incidents described above, Fresquez discovered another defect that he had identified in February 2016, but had not been repaired and had been removed from the TIMS system. *Id.* at 1494. Per the FRA's regulations, this defect required Fresquez to slow down the trains operating over the track containing the defect. *Id.* Consequently, Fresquez called the dispatcher and told him what action he was taking with regard to the track. *Id.* Approximately twenty minutes after placing the slow order on the track, Fresquez received a call from Paz directing him to meet at the site of the defect. *Id.* at 1498. Fresquez and Paz then met at the site of the reported defect. *Id.* at 1501. Also present on-site was Jay Herzog, a BNSF foreman, and Herzog's repair crew. *Id.*

  Paz stated that he did not see the defect that Fresquez had identified. *Id.* at 1503. Fresquez responded and said that the defect was not the type that could simply be seen and instead it had to be measured. *Id.* Paz asked Fresquez to measure the defect with a string-line. *Id.* at 1504. Fresquez believed that Paz was setting him up and intended to falsify information regarding the defect. *Id.* at 1503, 1504. Based upon that belief, and because he was concerned about being fined by the FRA and/or held responsible by Carpenter if the defect resulted in an accident, Fresquez did not measure the defect and instead got into his truck, drove approximately 200 feet away, and parked next to Herzog's crew who were preparing to fix some other track defects. *Id.* at 1504–05. Paz called Fresquez on his radio and asked him if he wanted to string-line the defect. *Id.* at 1506. Fresquez said to Paz, "I don't see the point. You have already made your decision." *Id.* at 1509. According to Fresquez, this statement meant that he believed that Paz had already decided to falsify the report regarding the defect. *Id.* Fresquez also believed that federal law afforded him the right to decline because he believed that what Paz was doing was illegal. *Id.* at 1510. Paz responded by saying, "I take that as a no." *Id.* at 1509. Fresquez replied, "I didn't say no." *Id.*

  Fresquez returned to the site of the defect and observed Paz and Herzog measuring the defect with a string line. *Id.* at 1510. Fresquez asked if the two men needed help. *Id.* Paz said "No, we'll have time to argue the facts later." *Id.* at 1510–11. Fresquez then asked Herzog if the defect was present and Herzog said yes. *Id.* at 1511.

32

> Someone entered information into the TIMS system indicating that the defect that Fresquez had observed, and that was confirmed by the measurements of Herzog and Paz, had been repaired that same day (May 5, 2016). *Id.*, Vol. VII at 1702. It is undisputed that neither Fresquez nor Herzog entered this information and, in fact, could not have done so. *Id.* at 1701–02. Carpenter conceded that the only person who could have entered this information was Paz. *Id.* at 1703. The information that was entered into the TIMS system regarding this defect was false. Specifically, it was untrue that the defect had been repaired. *Id.* at 1832. In fact, repairing the defect would have been a major undertaking because it would have required shutting down possibly three tracks in a high-traffic location. *Id.* at 1834. And, to Herzog's knowledge, the defect has never been repaired. *Id.* at 1838.

We conclude, contrary to BNSF's arguments on appeal, that this evidence would have allowed the jury to reasonably find that on May 5, 2016, Fresquez engaged in five distinct protected activities covered by § 20109. First, the jury could have reasonably found that Fresquez reported to Paz, in good faith, the existence of a continuing hazardous safety condition, i.e., a non-class specific track defect located in downtown Denver that had been previously identified but never repaired, and that required a section of track to be taken out of service. This protected activity would have fallen within the scope of § 20109(b)(1)(A).

Second, the jury could have reasonably found that during his conversation with Paz regarding the non-class specific track defect in downtown Denver, Fresquez also provided Paz, who was his direct supervisor, with information indicating that Fresquez was aware that Paz was seeking to violate federal law or regulations by reclassifying the

defect rather than repairing it in a timely fashion. This protected activity would have fallen within the scope of § 20109(a)(1)(C).[7]

Third, the jury could have reasonably found that Fresquez's refusal to reclassify the non-class specific defect, as requested by Paz, amounted to a "refus[al] to violate or assist in the violation of any Federal law, rule, or regulation relating to railroad safety or security," as outlined by § 20109(a)(2).

Fourth, the jury could have reasonably found that Fresquez provided information to an FRA agent regarding conduct that Fresquez reasonably believed constituted a violation of federal law or regulations relating to railroad safety, i.e., that Paz wanted him to reclassify the non-class specific defect, rather than repairing the defect, so that trains could continue to run on the track where the defect was located. This protected activity would have fallen within the scope of § 20109(a)(1)(A).

Fifth, the jury could have reasonably found that Fresquez acted in good faith when he refused to help Paz measure the second track defect that Fresquez had identified that day because Fresquez reasonably believed that Paz was attempting to have Fresquez assist him in covering up, or otherwise falsifying information about, the existence of the defect. This protected activity would have fallen within the scope of § 20109(a)(2).

---

[7] Nothing in the plain text of § 20109(a)(1)(C) indicates that the provision is not violated if the employee reports the information to the "person with supervisory authority over the employee," and that same person, i.e., the one with supervisory authority over the reporting employee, is also the one responsible, or potentially responsible, for the violation of federal law or regulations.

### 4. BNSF's remaining arguments

BNSF makes a host of arguments aimed at attempting to establish that none of the above-listed activities were in fact protected activities under § 20109. For the reasons outlined below, we conclude that BNSF's arguments all lack merit.

### a) Refusing to reclassify

BNSF argues that Fresquez's conduct on May 5, 2016, in "[r]efusing to reclassify the track" defect as requested by Paz "is not actionable" under § 20109(a)(2) because it "is exactly the conduct covered by subparagraph (b)(1)(C)." Aplt. Br. at 22. In other words, BNSF argues that "the district court should have required [Fresquez] to meet . . . the more stringent requirements of subparagraph (b)(1)(C) and paragraph (b)(2)," rather than allowing Fresquez to rely on § 20109(a)(2). *Id*. The district court's "failure to do so," BNSF argues, "was an error of law." *Id*.

To resolve BNSF's arguments, we turn to the statutory text. Section 20109(a)(2), as we have noted, provides, in relevant part, that a railroad

> may not discharge, demote, suspend, reprimand, or in any other way discriminate against an employee if such discrimination is due, in whole or in part, to the employee's lawful, good faith act done . . . to refuse to violate or assist in the violation of any Federal law, rule, or regulation relating to railroad safety or security.

49 U.S.C. § 20109(a)(2).

In turn, § 20109(b), which is entitled "Hazardous safety or security conditions," provides, in pertinent part, as follows:

(1) A railroad carrier . . . shall not discharge, demote, suspend, reprimand, or in any other way discriminate against an employee for--

. . . .

(C) refusing to authorize the use of any safety-related equipment, track, or structures, if the employee is responsible for the inspection or repair of the equipment, track, or structure, when the employee believes that the equipment, track, or structures are in a hazardous safety or security condition, if the conditions described in paragraph (2) exist.

(2) A refusal is protected under paragraph [(1)(C)] if--

(A)    the refusal is made in good faith and no reasonable alternative to the refusal is available to the employee;

(B)    a reasonable individual in the circumstances then confronting the employee would conclude that--

(i)    the hazardous condition presents an imminent danger of death or serious injury; and

(ii)    the urgency of the situation does not allow sufficient time to eliminate the danger without such refusal; and

(C)    the employee, where possible, has notified the railroad carrier of the existence of the hazardous condition and the intention not to perform further work, or not to authorize the use of the hazardous equipment, track, or structures, unless the condition is corrected immediately or the equipment, track, or structures are repaired properly or replaced.

49 U.S.C. § 20109(b)(1)(C), (b)(2).

Both § 20109(a)(2) and § 20109(b)(1)(C) reflect a general congressional concern for railroad safety and security. But the purpose of each section is different. Section 20109(a)(2), by its plain text, protects railroad employees who "refuse to violate or assist in the violation of any Federal law, rule, or regulation relating to railroad safety or security." 49 U.S.C. § 20109(a)(2). Section 20109(b)(1)(C), in contrast, protects railroad employees who refuse to authorize the use of equipment, track, or structures when those

36

employees "believe[] that the equipment, track, or structures are in a hazardous safety or security condition."[8]  49 U.S.C. § 20109(b)(1)(C).

Notably, Congress has imposed what the Eighth Circuit has characterized as a "reasonableness requirement" on railroad employees seeking protection under § 20109(b)(1)(C), but not on those railroad employees seeking protection under § 20109(a)(2).  *See Monohon v. BNSF Ry. Co.*, 17 F.4th 773, 780–81 (8th Cir. 2021) (discussing § 20109(b)(1)(B)).  To be entitled to protection under § 20109(b)(1)(C), a railroad employee must demonstrate that his or her refusal to authorize the use of equipment, track, or structures was "made in good faith and no reasonable alternative to the refusal [wa]s available to the employee," 49 U.S.C. § 20109(b)(2)(A), and that

> a reasonable individual in the circumstances then confronting the employee would conclude that--
> (i)      the hazardous condition present[ed] an imminent danger of death or serious injury; and
> (ii)     the urgency of the situation d[id] not allow sufficient time to eliminate the danger without such refusal . . . .

*Id*. § 20109(b)(2).  This "reasonableness requirement" functions to prevent railroad employees from prevailing on a § 20109(b)(1)(C) claim based purely on their own subjective opinion that the equipment, track, or structures at issue were in a hazardous safety or security condition.

---

[8] Section 20109(b)(1)(B) is similar in that it protects railroad employees who "refus[e] to work when confronted by a hazardous safety or security condition related to the performance of the employee's duties."  49 U.S.C. § 20109(b)(1)(B).

Presumably, Congress did not impose a similar reasonableness requirement on railroad employees seeking protection under § 20109(a)(2) because that section already effectively incorporates an objective standard of proof. Specifically, an employee seeking protection under § 20109(a)(2) must establish that they were asked or directed to "violate or assist in the violation of" a specific "Federal law, rule, or regulation relating to railroad safety or security." Section 20109(b)(1)(C), in contrast, does not require any such proof. In other words, an employee seeking protection under § 20109(b)(1)(C) does not have to establish that the perceived "hazardous safety or security condition" constitutes or arises out of a violation of any "Federal law, rule, or regulation relating to railroad safety or security." *Id.* § 20109(a)(2). Instead, as noted, they must establish the objective reasonableness of their safety or security concern.

Although it is easy to imagine circumstances that implicate only one or the other of these two statutory provisions, BNSF argues that the case at hand presents circumstances that implicate both statutory provisions. And BNSF in turn argues that, in circumstances such as this, the railroad employee must proceed only under § 20109(b)(1)(C). This is so, BNSF asserts, because § 20109(b)(1)(C) imposes "more stringent" or "heightened" requirements than does § 20109(a)(2). Aplt. Br. at 22.

We reject BNSF's arguments. To begin with, we are not persuaded that § 20109(b)(1)(C)'s objective reasonableness requirement is "more stringent" than § 20109(a)(2)'s requirement that the railroad employee establish that they were asked or directed to "violate or assist in the violation of any Federal law, rule, or regulation

38

relating to railroad safety or security." Further, even if we were to assume that

§ 20109(b)(1)(C)'s objective reasonableness requirement is more stringent, nothing in

§ 20109 indicates Congress's intent for § 20109(b)(1)(C) to preempt or override

§ 20109(a)(2) in circumstances where both provisions are implicated. In other words, a

reading of § 20109 leads us to conclude that in circumstances where both provisions are

implicated, the railroad employee is free to pursue an action under either provision or

both provisions.

Here, Fresquez clearly alleged, and ultimately proved at trial, circumstances that

fell within the scope of § 20109(a)(2). Thus, even if those circumstances also fell within

the scope of § 20109(b)(1)(C), it was not error on the part of the district court to refuse to

require Fresquez to allege and prove that BNSF violated § 20109(b)(1)(C).

### b)  Calling the FRA

BNSF next argues that Fresquez's conduct in calling the FRA agent on May 5,

2016, should be treated "as part and parcel of" his conduct in refusing to reclassify the

defect. Aplt. Br. at 25. In support, BNSF argues that "[t]he only purpose of the call was

to ask whether Fresquez could issue a slow order on the track so as to authorize its use."

*Id*. Although BNSF is essentially correct about the purpose of Fresquez's call to the FRA

agent, i.e., Fresquez called the FRA agent to confirm his own conclusion that

reclassifying the track would violate federal regulations, BNSF is clearly wrong in

suggesting that the call was indistinct from Fresquez's action in refusing to reclassify the

39

defect.  In fact, the two actions were factually distinct and, in turn, fell within the scope of two different subsections of § 20109(a).

BNSF also argues that calling the FRA agent "does not fit under [§] 20109(a)(2) because it did not constitute refusing to violate or assist in violating any federal law." *Id*. BNSF's argument is correct as far as it goes.  But it ignores the key point that Fresquez's call to the FRA agent actually constitutes a protected activity under § 20109(a)(1), i.e., providing information "regarding any conduct which the employee reasonably believes constitutes a violation of any Federal law, rule, or regulation relating to railroad safety or security" to "a Federal . . . regulatory . . . agency."  49 U.S.C. § 20109(a)(1)(A). Although BNSF points to a portion of Fresquez's cross-examination where he stated that he never reported any misconduct by any BNSF manager to the FRA, the fact remains that, according to Fresquez's testimony on direct examination, he called the FRA agent, they "talked about the situation at hand" and the FRA agent "said, Yes, you are correct, . . . you can't reclassify a defect."  Aplt. App., Vol. VI at 1490.  Based upon this testimony, the jury could have reasonably inferred that Fresquez informed the FRA agent that Paz asked him to reclassify the defect and thereby provided the FRA agent with information regarding "conduct which [Fresquez] reasonably believe[d] constitute[d] a violation of any Federal law, rule, or regulation relating to railroad safety."  49 U.S.C. § 20109(a)(1).

Finally, BNSF argues that "[t]here is an additional problem" regarding Fresquez's call to the FRA agent.  Aplt. Br. at 26.  BNSF notes that at trial, "Fresquez argued that

Paz and Carpenter were decisionmakers on the theory that Paz reported the incident that led to the investigation, Carpenter chose to initiate the investigation with a charge of insubordination . . . , and Paz lied at the investigation hearing." *Id*. at 26–27.  BNSF disagrees with this contention and asserts that it is undisputed that Detlefsen and Miller were the independent decisionmakers and "[t]hat in fact is what [the district court] ruled as a matter of law." *Id*. at 27.  BNSF complains, however, that the district court "then refused to instruct the jury according to that ruling, which allowed Fresquez's counsel to argue that Paz and Carpenter were decisionmakers." *Id*. (citation omitted).  BNSF argues that "[t]his Court need not reach that question, however," because, "[e]ven assuming that Paz or Carpenter were decisionmakers[,] there is no evidence they had knowledge of the claimed protected activity of [Fresquez] [c]alling the FRA—and more importantly[,] of any *contents* of that call that would place it within the statutory provision." *Id*. at 28.

To the extent BNSF is attempting to challenge the district court's refusal to instruct the jury regarding his ruling on who the decisionmakers were, BNSF has not raised that as a distinct issue on appeal, and, as noted, essentially disclaims this issue. Consequently, we summarily reject it.

As for BNSF's argument regarding Paz's and Carpenter's knowledge of Fresquez's phone call to the FRA agent, Fresquez's testimony on direct examination is relevant.  Fresquez testified that on the morning of May 5, 2016, he initially texted Paz and told him he was going to "take the track out of service" due to the existence of the defect, and that he and Paz "ended up talking on the phone" about it.  Aplt. App., Vol. VI

41

at 1489. Fresquez testified that Paz "want[ed] [him] to change it to a class-specific defect, which [would have] mean[t] [that Paz could] run the trains at full speed" on the track. *Id.* Fresquez then testified: "I t[old]him I was going to call the FRA. Well, I said, Let me call my friends in high places," and that they "end[ed] the conversation." *Id.* Based upon this testimony, in combination with the other evidence presented at trial (e.g., regarding Fresquez's history of working with Paz), the jury could have reasonably inferred that Paz knew who Fresquez intended to call when he referred to "friends in high places." The jury also could have reasonably inferred that this action by Fresquez could have played a role in Paz deciding later that same day to report Fresquez's conduct to Carpenter, and in turn could have played a role in Carpenter choosing to charge Fresquez with insubordination.

### c) *Refusing to measure*

BNSF argues that Fresquez's refusal to measure the track on May 5, 2016 "is not actionable protected activity" for two reasons. Aplt. Br. at 30. First, BNSF argues that this conduct fell within the scope of § 20109(b)(1)(B), which applies when a railroad employee "refu[ses] to work when confronted by a hazardous safety or security condition related to the performance of the employee's duties." 49 U.S.C. § 20109(b)(1)(B). Therefore, BNSF argues, Fresquez was precluded from claiming that the conduct fell within the scope of § 20109(a)(2). We reject BNSF's argument for the same reasons discussed above regarding Fresquez's refusal to reclassify the defect found on the morning of May 5, 2016. In short, whether or not Fresquez's refusal to measure the track

constitutes a violation of § 20109(b)(1)(B), it clearly fell within the scope of

§ 20109(a)(2) and nothing in § 20109 required Fresquez to allege anything beyond or

other than that specific violation.

BNSF in turn argues that "measuring the track would be in no way a violation of

the law" and instead "was the normal expected activity of a track inspector in this

scenario." Aplt. Br. at 31. We agree with BNSF that, under normal circumstances,

measuring a track is one of the normal duties of a track inspector. But the jury in this

case could reasonably have agreed with Fresquez that "[m]uch of [his] conduct in May

2016," including his refusal to measure the track on May 5, 2016, amounted to a refusal

to assist Paz in violating federal regulations. Aple. Br. at 42. As Fresquez notes, the

evidence he presented at trial would have allowed the jury to find that he "had been

avoiding participating—and attempting to thwart—his supervisors' illegal conduct" in

"remov[ing] defects from the TIMS system or falsely mark[ing] them as repaired,

[thereby] violating federal regulations that required these tracks to be taken out of service

after a 30-day repair window." *Id.* Indeed, earlier on May 5, 2016, Fresquez had refused

Paz's request to falsely reclassify a non-class specific defect and in turn had called the

FRA agent to discuss the matter. Later, when Fresquez and Paz met at the site of the

second defect identified by Fresquez, Paz began the encounter by telling Fresquez that he

did not see the defect, even though, according to Fresquez, Paz was aware that the defect

was of a type that could not be observed with the naked eye. We conclude that the jury

could have reasonably agreed with Fresquez that "Paz asked Fresquez to perform a

useless measurement of an already-known defect" and "that Paz's . . . request was an attempt to ensnare Fresquez in Paz's illegal schemes and would lead to Paz removing the defect from the system."[9] *Id.* at 42–43. In other words, although participating in simply measuring the defect would not have itself been a violation of federal law or regulations, the jury could have reasonably found that Fresquez believed that such an act would have amounted to willing and knowing participation in Paz's goal of removing the defect from the TIMS system without actually repairing it.

### 5. BNSF's same-decision defense

In its second general issue on appeal, BNSF argues that it is also entitled to judgment as a matter of law on the merits of Fresquez's FRSA claim because it demonstrated by clear and convincing evidence that it would have terminated Fresquez's employment even in the absence of him engaging in protected activity under the FRSA.

BNSF made this same argument, both at the conclusion of all the evidence, and again in its post-judgment motion for judgment as a matter of law. At the conclusion of all the evidence, the district court denied BNSF's motion for judgment as a matter of law on this issue, noting that both Miller and Detlefsen "testified that they relied on . . . Paz's

---

[9] Paz conceded during his testimony at trial that the track defect at issue had been in existence for some time, and that he did not need to call Fresquez out to the site of the defect to remeasure it. Aplt. App., Vol. VII at 1742. Herzog, who was a direct witness to the incident, testified that after Paz asked Fresquez to measure the defect, Fresquez stated to Paz, "You're just trying to prove that this defect isn't here," and "You're trying to measure this and say that there's no defect here when we know there's a defect here." *Id.* at 1835.

44

testimony to support the insubordination charge, and plaintiff has submitted evidence that

. . . Paz may have slanted his hearing testimony against the plaintiff and may have been

dishonest and outright lied during the hearing." Aplt. App., Vol. X at 2491. In rejecting

BNSF's post-judgment motion, the district court stated:

> BNSF contends that it is entitled to judgment as a matter of law because it would have dismissed Fresquez regardless of his claimed protected activity because "BNSF has a written rule prohibiting insubordination and making it [a] stand-alone dismissible offense." (ECF No. 209 at 17.) BNSF argues that it "consistently enforces its rules relating to insubordination, and has discharged other employees for violating this rule." (*Id*.) It further points out that Fresquez's "dismissal was decided by a senior manager and a corporate representative that were far removed from [Fresquez's] alleged protected activities." (*Id*.)
>
> In response, Fresquez argues that "BNSF did not prove, much less by clear and convincing evidence, that Fresquez was insubordinate" and that "[t]he jury could infer from the evidence that Paz did not order Fresquez to string-line the defect and instead asked Fresquez whether he wanted to remeasure the defect, a distinction which Miller conceded is dispositive on the issue of whether Fresquez was insubordinate." (ECF No. 226 at 25.) Fresquez likewise contends that BNSF "did not prove that it has terminated every other similar situated employee who has questioned a similar order in the manner Fresquez questioned Paz's order," whereas Fresquez "offered evidence of other employees not being fired despite engaging in objectively more insubordinate conduct." (*Id*. at 26–27.)
>
> After reviewing the evidence and drawing all inferences in Fresquez's favor, the Court finds that a reasonable jury could conclude that there was some ambiguity regarding whether Fresquez was truly insubordinate (or whether Paz was searching for a reason to terminate him) and whether BNSF would have charged a similarly situated employee with insubordination instead of a non-dismissible offense like failure to follow orders. Accordingly, the evidence at trial does not require an unambiguous conclusion that BNSF has proved its affirmative defense by clear and convincing evidence. The Court therefore also denies this portion of BNSF's Rule 50(b) Motion.

*Id*., Vol. III at 876–77.

45

In challenging the district court's decision, BNSF begins by citing to other cases in which courts have "granted judgment as a matter of law to BNSF" on the same-decision defense. Aplt. Br. at 33–34. We conclude that those cases are largely irrelevant, however, because they involved different sets of facts than are at issue in this case.

BNSF in turn argues that its PEPA "rules prohibit insubordination" and "treat[] it as a stand-alone dismissible offense." *Id*. at 34. BNSF further argues that it "followed the procedures in the collective bargaining agreement for Fresquez's disciplinary procedure, including through providing a hearing where Fresquez could present witnesses and question BNSF's witnesses." *Id*. at 34–35. "The dismissal decision," BNSF notes, "was made by a senior manager [Miller] and a corporate representative [Detlefsen] that were far removed from Fresquez's alleged protected activities." *Id*. at 35. BNSF asserts that it "consistently enforces its rules relating to insubordination, and has discharged other employees for violating this rule." *Id*. Finally, BNSF asserts that "Fresquez's own witnesses and experts agree that insubordination is a serious offense at BNSF and in the railroad industry generally." *Id*.

BNSF's arguments, however, ignore key evidence that was presented at trial. It is true, to be sure, that BNSF's PEPA rules expressly prohibit insubordination and treat it as a stand-alone dismissible offense. But the evidence presented at trial also established that BNSF's PEPA rules outline a separate offense entitled "failure to comply with instructions" that is not a stand-alone dismissible offense. Further, the evidence established that in practice the distinction between "insubordination" and "failure to

46

comply with instructions," both in their wording and in practice, is unclear and subjective, and that this lack of distinction has historically been employed by BNSF's management employees to the disadvantage of certain BNSF employees. For example, Staci Moody-Gilbert, the general chairwoman for the Brotherhood of Maintenance Way Employees Division, testified that, in her experience assisting BNSF employees who are union members, "if you're a liked employee, . . . you are going to get the failure to comply with instruction rule" applied to you, but "[i]f you're not so well liked" by management, "you're going to get the insubordination rule." Aplt. App., Vol. VI at 1358. In light of this and the other evidence presented at trial, the jury could reasonably have found that Paz and Carpenter knowingly chose to charge Fresquez with insubordination, rather than failure to comply with instructions, because they were unhappy with him calling into question their practice of removing defects from the TIMS system without repairing them and therefore knowingly chose to target Fresquez for termination.

As for the disciplinary hearing procedures cited by BNSF, the collective bargaining agreement that existed between BNSF and the union provided that any employee who had sixty or more days of service with BNSF could not be disciplined or discharged until they were afforded a fair and impartial hearing or investigation. *Id*. at 1330. The evidence presented at trial, however, would have allowed the jury to find that the hearing process was weighted in favor of BNSF management. To begin with, BNSF management determined which employees would testify at the hearing in support of the alleged charge and paid only those selected employees for their time appearing at the

47

hearing. Although the charged employee could request to present his or her own witnesses, those BNSF employees were not paid for their time appearing at the hearing. A BNSF management employee presided over the hearing and effectively acted as the hearing officer. In that role, the presiding BNSF management employee questioned the witnesses, ruled on objections, and ultimately prepared written findings of fact. The charged BNSF employee could not have legal representation at the hearing, and instead had to either proceed pro se or have a union representative (non-lawyer) appear on his or her behalf. The presiding BNSF management employee's findings of fact were forwarded to division management employees and BNSF's Labor Relations Department, who determined whether to uphold the alleged charge or remove or reduce the charge. In making that determination, the division management employees and the Labor Relations Department were limited to the record produced at the hearing.

As those procedures played out in this case, Carpenter charged Fresquez on May 5, 2016, with insubordination for allegedly refusing to measure the track defect. Carpenter admitted at the trial in this case that he spoke only to Paz before making the charge, and did not speak with either Fresquez or Herzog. Carpenter also admitted that it was a subjective decision on the part of management whether to charge an employee with insubordination or failing to follow instructions. On May 6, 2016, Carpenter sent an email to Paz directing him what he should do and say at the hearing on the charge. For example, Carpenter stated in his email: "I would answer [the hearing officer's] initial question about what happened by simply saying 'Employee refused to get tools and

48

measure repaired track defect when instructed to do so'." Aple. App., Vol. V at 1207.

Carpenter further stated: "[B]e firm about your instructions being clear and direct, not

light and optional." *Id*. Lastly, Carpenter stated:

> Herzog's statement although not strong does give insight into some potential reasons [Fresquez] might use as an excuse for his actions. We've not listed Herzog as a witness and are not intending to have him at the Hearing which is correct but do have the option to call if as things develop, it becomes apparent his testimony is needed.

*Id*. At the trial in this case, Carpenter conceded that he could not think of any other

employee who had been discharged for refusing to remeasure a defect, and likewise

conceded that he did nothing in response to Fresquez's claim that Paz was trying to

remove the defect from the TIMS system.

At the hearing on the insubordination charge, Paz essentially testified as directed

by Carpenter. Notably, Paz testified at the hearing, in direct opposition to the great

weight of the evidence that was presented at the trial in this case, that he and Herzog

could not find any defect and, in turn, that he did not remove the slow order from the

track. Fresquez also testified and provided his side of the story. According to Fresquez,

he was the one who initially "brought up the stringlining" because Paz had "made up his

decision to take the defect off without stringlining it." Aplt. App., Vol. X at 2630. In

other words, Fresquez testified that Paz "[b]asically stat[ed] that he ha[d] the right just to

take off the defect as he please[d]" and that Fresquez "ha[d] to prove the defect [wa]s

there." *Id*. at 2631. Fresquez testified that because of Paz's statements, he "thought that

it would be pointless to stringline if [Paz] was already going to remove the defect." *Id*. at 2634.

The hearing record was then sent to Detlefsen, who reviewed the transcript and concluded that Paz was telling the truth and Fresquez was lying. The matter then went to Miller, who at that time served as the general director for BNSF's Powder River Division and was Carpenter's supervisor. Like Detlefsen, Miller concluded, based upon reading the hearing transcript, that Paz's testimony at the hearing was credible. He therefore decided to discharge Fresquez for insubordination.[10]

Considering all of this evidence together, the jury could have reasonably found that Paz and Carpenter were looking for a reason to terminate Fresquez's employment because Fresquez refused to go along with their misinterpretation of the applicable regulations, was aware of and in fact was calling out Paz's actions in removing unrepaired defects from the TIMS system, and was willing to call the FRA about those violations. The jury in turn could have reasonably believed Fresquez's version of what transpired on May 5, 2016, regarding the measurement of the defect, and thus could have reasonably found that Paz and Carpenter knowingly used that incident to charge Fresquez with the dismissible offense of insubordination. The jury could also have reasonably

---

[10] The jury in this case could have reasonably found that Miller did not make an objective determination regarding Fresquez's discipline. Notably, Miller sat through the entire trial in this case and testified that nothing he heard during the trial caused him to question his decision to discharge Fresquez. Indeed, Miller testified that he would not change his decision even if Paz lied during his testimony at the disciplinary hearing.

found that Carpenter and Paz knowingly took steps to limit what evidence was presented

at the disciplinary hearing, and that Paz actually lied at the hearing when he testified

about what happened on May 5, 2016. Thus, in sum, the jury could have reasonably

found that the two purported decisionmakers, i.e., Miller and Detlefsen, were not in fact

independent at all, and that their decisions were significantly impacted by the actions and

misconduct of Paz and Carpenter. In other words, we agree with Fresquez that the

evidence presented at trial would have allowed the jury to reasonably find "that the

insubordination charge used to justify [his] termination was false, pretextual, and

motivated by discriminatory animus." Aple. Br. at 59.

For all of these reasons, we conclude that BNSF has failed to demonstrate by clear

and convincing evidence that it would have discharged Fresquez from his position even

absent his involvement in activities that are protected under § 20109.

*B.  Is BNSF entitled to a new trial due to the district court's admission of character evidence and/or other allegedly prejudicial evidence?*

In its third issue on appeal, BNSF argues that it is entitled to a new trial because

the district court erroneously admitted improper character evidence and other highly

prejudicial evidence. In support, BNSF asserts that "Fresquez's [trial] strategy was to

distract the jury with irrelevant allegations of wrongdoing on the part of Carpenter and

Paz," and he "spent the better part of a week attempting to prove that they intentionally

violated federal regulations, falsified records by removing defects from the system that

had not been repaired, and pressured subordinates to misreport defects."[11]  Aplt. Br. at

37.  BNSF in turn asserts that Fresquez "also chose to offer evidence having no

reasonable relationship to the facts in this case in an effort to prejudice the jury against

BNSF."  *Id.*  That evidence, BNSF asserts, related to Paz and included "allegations of

unlawful environmental contamination and forging documents, in both cases 17 months

after Fresquez's discharge."  *Id.* at 15.  BNSF asserts that this "was improper character

evidence, highly prejudicial, and very likely affected the verdict, thus warranting a new

trial."  *Id.*

### 1)  Standard of review

"We review for abuse of discretion a district court's denial of a rule 59(a) motion

for new trial."  *Stroup v. United Airlines, Inc.*, 26 F.4th 1147, 1168 (10th Cir. 2022)

(quotation marks omitted).  "Likewise, when the issue of whether to grant a new trial

hinges on the admissibility of evidence," we review for abuse of discretion the admission

of the challenged evidence.  *Id.* (quotation marks and brackets omitted).  It is well

---

[11] We note that the allegations that BNSF now refers to as a "distraction" were consistently alleged by Fresquez as a central part of his claim of retaliation against BNSF.  For example, in the final pretrial order, Fresquez described his claims, in pertinent part, as follows: "Fresquez long suspected that his supervisor's supervisor— Mark Carpenter—and some of the supervisors under Carpenter were circumventing federal regulations regarding when damaged track needed to be taken out of service or have the speed limit on them reduced," and "Fresquez continued objecting to [their] circumvention of the federal regulations regarding rail safety, to the point [where] Carpenter and his right-hand man—Mike Paz—resorted to accusing Fresquez of being insubordinate and terminate[d] him for it."  Aplt. App., Vol. I at 64–65.

established that "evidentiary rulings are within the sound discretion of the district court." *Id*. (quotation marks omitted). Consequently, "we will reverse only upon a definite and firm conviction that the lower court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." *Id*. (quotation marks and brackets omitted).

### 2) *Procedural history of the issue*

Prior to trial, BNSF filed a motion in limine to exclude what it asserted was improper character evidence regarding alleged unrelated misconduct. In the motion, BNSF alleged that Fresquez "intend[ed] to introduce at trial evidence that his supervisor [Paz] engaged in misconduct separate and apart from his dismissal, including allegations that" Paz: (a) "[a]t some point in 2016 . . . was accused of not completing employee safety interviews but saying that he had"; (b) "surreptitiously recorded a safety briefing" in August 2016; (c) "improperly filled a ditch or culvert with contaminated soil" in "2016 or 2017"; and (d) allegedly failed to "fully or properly repair track defects" in or around July 2017. Aplt. App., Vol. I at 108–09. BNSF argued that "[n]one of this alleged misconduct ha[d] anything to do with [Fresquez's] allegations in this case," and that Paz "denie[d] engaging in the misconduct." *Id*. at 109. The district court deferred ruling on BNSF's motion in limine until trial.

During the trial, Fresquez presented testimony from David Dunn, a BNSF employee who worked as a division assistant roadmaster under Carpenter. Dunn thus had the same title and responsibilities as Paz, knew and was familiar with Paz, and also

53

occasionally supervised Fresquez.  Dunn testified, in pertinent part, that he twice reported Paz to BNSF for violating safety rules and regulations.  On one of those occasions, Dunn testified, he reported that Paz was dumping toxic soil into a waterway, which Dunn believed was a violation of federal law.  BNSF objected to Dunn's testimony on this point, arguing that it "ha[d] nothing to do with . . . Fresquez."  *Id.*, Vol. VIII at 1926.  The district court overruled the objection, noting that it "s[aw] some tangential relevance" to the testimony.  *Id.*

Dunn subsequently testified on direct examination that one of his and Paz's responsibilities was to conduct annual safety interviews with the union-level employees they supervised.  Dunn testified that he became concerned on one occasion that Paz had failed to conduct his required safety interviews, but that Paz had nevertheless reported to BNSF that he had completed those interviews.  Dunn testified that he spoke with some of the employees who Paz was responsible for interviewing and they all "said they had not had any interaction with . . . Paz about their safety annual interview[s]."  *Id.* at 1936.  According to Dunn, he raised that concern with his manager.

BNSF renewed its objection to this portion of Dunn's testimony, and the district court again noted that it saw some relevance to the testimony:

> The problem with [BNSF's] argument is that I think that this testimony has some relevance to the culture that existed at the railroad.  And I don't think it's limited to July of 2017.  I think it just shows Mr. Paz's conduct in the workplace.  And even though it's some months after Mr. Fresquez was terminated, it relates to the same kind of work in a similar environment.  And this witness is someone who worked with both Paz and Fresquez.

54

So what I'm going to do is say that under 403 the probative value outweighs prejudicial effect.

*Id*. at 1932–33.

BNSF attempted to rebut Dunn's testimony by presenting testimony from Dane Freshour, the regional director of human resources for BNSF's north region. Freshour testified, in pertinent part, that BNSF's human resources department had received a complaint that Paz had not completed his annual safety interviews during 2017. According to Freshour, his department investigated the complaint by questioning both Paz and the employees he was supposed to have interviewed, and the department ultimately concluded that Paz had completed those interviews.

Following the district court's entry of judgment in favor of Fresquez, BNSF filed a motion for new trial. In that motion, BNSF argued, in pertinent part, that the district court's admission of Dunn's testimony about the toxic soil and employee safety interview issues, along with testimony from other witnesses, "permitted [Fresquez] to distract the jury from his own lack of protected activity and instead base their verdict on the perceived wrongdoing of . . . Carpenter and . . . Paz." *Id*., Vol. III at 714. BNSF argued that "this evidence was irrelevant," "unduly prejudicial, "and/or improper character evidence." *Id*. at 716.

The district court denied BNSF's motion for new trial and concluded, "after reviewing the challenged . . . evidentiary rulings, . . . that BNSF ha[d] failed to establish

that the . . . evidentiary rulings substantially and adversely affected its rights such that a new trial [wa]s necessary." *Id*. at 889.

### 3) *Analysis*

BNSF argues in its appeal that "[t]he only point of" this challenged "evidence was to impugn the character of" Paz in order "to suggest that he was a law violator, a rule violator, and dishonest on matters other than concerning track defects, thus suggesting that he must have been so with respect to track defect issues as well." Aplt. Br. at 39. Consequently, BNSF argues, the "evidence falls squarely within Rule 404's prohibitions." *Id*. at 40. BNSF in turn argues that "[t]he evidence was . . . highly prejudicial" because "[t]he result was that the jury heard inflammatory testimony labeling a key player in the case as having engaged in illegal environmental dumping." *Id*. at 40–41. BNSF also argues that this evidence "improperly bolstered Fresquez's other attacks on Paz concerning track defects and painted him as a rogue manager." *Id*. at 42. Indeed, BNSF argues, "[t]hat evidence may well explain the jury's finding of retaliation notwithstanding the lack of evidence of cognizable protected activity as well as the grossly excessive award of compensatory damages." *Id*.

Federal Rule of Evidence 404(b)(1) provides that "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." But Rule 404(b)(2) also provides that such evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of

56

mistake, or lack of accident." Fed. R. Evid. 404(b)(2). "This list of permissible uses is illustrative, not exhaustive," and thus "[t]he rule admits all other-act evidence except that tending to prove only propensity." *United States v. Armajo*, 38 F.4th 80, 84 (10th Cir. 2022). "A valid purpose under Rule 404(b) is not the end of the story, however." *Id.* "Even otherwise relevant evidence may be subject to exclusion under Rule 403, which provides that evidence may be excluded if its probative value is substantially outweighed by a danger that it will lead to unfair prejudice, confusion of the issues, or wasted time." *Id.* (citing Fed. R. Evid. 403).

We conclude that the district court did not abuse its discretion in determining that this challenged testimony from Dunn was relevant. To be sure, the testimony concerned allegedly wrongful conduct by Paz that occurred after Fresquez was terminated from his position. Nevertheless, as the district court explained on the record in admitting the evidence, the testimony was relevant because it showed Paz's general mode of operating in the BNSF workplace and, in turn, the type of work environment that he created, with Carpenter's approval. Although BNSF suggests otherwise, Fresquez presented significant evidence that Paz, sometimes at Carpenter's direction and most certainly with his express or implicit approval, routinely ignored applicable federal safety regulations relating to track defects. More specifically, that evidence established that Carpenter openly disputed and defied the well-accepted interpretation of the federal safety regulations requiring non-class specific track defects to be repaired within thirty days, and that Paz adopted the same stance by failing to timely require such defects to be

57

repaired or, alternatively, by removing those defects from the TIMS system without repaired them. The evidence presented by Fresquez also established that Paz created an atmosphere of intimidation among the union-level employees he supervised, specifically encouraging his supervisees to ignore the applicable safety regulations and effectively ostracizing or punishing those employees who stood up to him. It was undoubtedly all of this evidence that led the district court to conclude that Dunn's testimony regarding Paz's potential dumping of toxic soil and failure to conduct annual safety interviews was relevant for purposes of showing "the culture that existed at the railroad" under his supervision. Aplt. App., Vol. VIII at 1932.

We further conclude that the district court did not abuse its discretion in balancing the testimony's probative value against its prejudicial effect. Indeed, in our view, BNSF has greatly overstated the potential prejudicial impact of the challenged testimony by Dunn. Dunn's testimony on the toxic soil and annual safety review issues was very brief. Further, the two alleged instances of improper conduct that Dunn testified to were not more egregious in nature than the wrongful conduct that Fresquez and other witnesses described when they testified about Paz removing defects from the TIMS system and otherwise ignoring federal safety regulations regarding track defects.

Because the district court did not err in admitting the challenged testimony by Dunn, we conclude that the district court did not abuse its discretion in denying BNSF's motion for new trial.

58

C. *Did the district court err in denying BNSF's combined request for a new trial on the issue of compensatory damages or, in the alternative, a remittitur of compensatory damages?*

In its fourth issue on appeal, BNSF argues that the district court abused its discretion in denying BNSF's combined request for a new trial on the issue of compensatory damages or, in the alternative, a remittitur of compensatory damages. In support, BNSF asserts that "[t]he jury awarded Fresquez $800,000 in compensatory damages based on thin evidence of claimed emotional distress that was no more than 'garden-variety' distress." Aplt. Br. at 154. "That amount," BNSF asserts, "is grossly excessive so [this] Court should order a substantial remittitur." *Id*.

1) *Standard of review*

As previously noted, "we review for abuse of discretion a district court's denial of a rule 59(a) motion for new trial." *Stroup*, 26 F.4th at 1168 (quotation marks omitted). Likewise, "[w]e review a trial court's decision to deny remittitur of compensatory damages for abuse of discretion." *Burke v. Regalado*, 935 F.3d 960, 1035 (10th Cir. 2019). "As the reviewing court, we must view the evidence in the light most favorable to the prevailing party." *Id*. (quotation marks omitted).

"To determine whether remittitur is appropriate, courts must evaluate whether the evidence supports the verdict." *Id*. "The jury has wide latitude to choose an award based on the evidence." *Id*. (quotation marks and brackets omitted). "Remittitur is appropriate only when the jury award is so excessive . . . as to shock the judicial conscience and to

59

raise an irresistible inference that passion, prejudice, corruption or another improper cause invaded the trial." *Id*. (quotation marks omitted).

### 2) *Procedural history of the issue*

In the final pretrial order, Fresquez alleged, in pertinent part, that he was entitled "to his wage and benefit loss, in an amount to be determined by the jury," "front pay in lieu [of reinstatement] in an amount to be recommended by the jury and decided by the Court," and "compensatory damages for garden-variety emotional distress in an amount to be determined by the jury." Aplt. App., Vol. I at 68. The district court subsequently concluded that it would determine the amount of front and back pay.

During the trial, Fresquez testified about his son, who was born shortly after Fresquez began working for BNSF. Fresquez testified that he is the primary care provider for his son. Fresquez also testified that his son has various health issues that are expensive to deal with, and that, as a result, the health insurance plan that was provided to him by BNSF was important. According to Fresquez, the termination was "extremely hard" on him and "really stressful." *Id*., Vol. VI at 1517. Fresquez testified that it forced him "to find new jobs," and that the employee benefits at those new jobs were "not as good" as those he received from BNSF. *Id*. Fresquez's counsel asked him on direct examination if the termination "[h]a[d] . . . changed who [he] [was] as a person?" *Id*. Fresquez testified that it had, and he proceeded to explain: "I don't sleep no more," "[m]y stress levels are out the door," and "I got fat." *Id*. at 1518. Fresquez further testified that when he worked for BNSF, he coached a youth baseball team, but that the stress of the

termination caused him to quit coaching. Fresquez also testified that the stress of the termination had affected his enjoyment of everything in his life.

During cross-examination by BNSF's counsel, Fresquez conceded that he had not seen a mental health provider for counseling following the termination of his position at BNSF. BNSF's counsel also asked Fresquez about his decision to quit coaching the youth baseball team and when that occurred. Fresquez admitted that he "[c]oached for two years" after his termination, but that the stress of the situation "really took a toll on" him and he "started coaching the way [he] didn't want to be coaching," so he "decided [he] no longer wanted to coach." *Id*., Vol. VII at 1622. Lastly, BNSF's counsel asked Fresquez about health insurance coverage for his son. Fresquez testified that he was able to keep the BNSF-provided health insurance for approximately five months following his termination, and that after that time his son "went on his mother's health insurance" plan. *Id*. at 1624.

During the closing arguments, Fresquez's counsel reminded the jury: "You heard that [Fresquez's] son . . . was born two days" after Fresquez began working for BNSF "and that because of [his son's] health conditions, benefits were very important to him. Not to mention, [Fresquez] is the primary care provider for his son, and so the wages were also important." *Id*., Vol. X at 2525. Later during the closing argument, Fresquez's counsel discussed the issue of damages:

> So now let's talk about Fresquez's damages. [Fresquez] is entitled to wage loss, emotional distress, and punitive damages. His wage loss and

61

benefit loss . . . from the time he was fired until the time he retires is $1,522,527.

[Defense counsel objected, arguing that evidence of Fresquez's wage loss "ha[d] been specifically excluded," and the district court sustained the objection]

So you are wondering . . . why are you putting up his wage loss if the Court's going to decide that? Here's why. A good rule of thumb for emotional distress damages is twice his wage and benefit loss. And here's the reason why. The reason lawyers use this is as follows: One-third of your life, eight hours a day, is spent at work. And you work so that the other two-thirds of your life is enjoyable. So when you are fired, when you are treated the way [Fresquez] was treated, when you are deprived of benefits, it bleeds over into those two-thirds. So a rule of thumb is the emotional distress damages should be double your wage loss, two-thirds of the time compared to one-third of the time. But there's no science to this. Maybe it's half that amount. Maybe it's what his wage loss is. Maybe it's half that amount. There's no real science to this.

You guys know what it's like to have to all of a sudden worry about your seniority, whether you are going to have a job, start a new career after a decade, to worry about your son's benefits and whether you are going to be able to afford his treatment, to tell your son you were fired for doing the right thing, to be so stressed out and unable to sleep at night. You stop liking the things you used to enjoy, like coaching baseball. You guys know what it's like to tell your son, Hey, you need to eat at Grandma's because I don't know the next time I can afford food.

There's no science to this. So the rule of thumb, double wage loss. Maybe it's equal to wage loss. Maybe it's half that amount. You guys talk about it. It's for you to decide.

*Id*. at 2555–56.

BNSF's counsel also discussed the issue of damages during his closing argument,

stating as follows:

Ladies and gentlemen, [Fresquez's counsel] just asked you to award . . . Fresquez $3 million for this emotional distress, $3 million, for emotional

62

distress that has affected him in really one way that he talked about. He can't coach baseball, meaning he's not the head coach for the baseball team. Hasn't sought counseling. Hasn't gone and seen a therapist. The emotional distress hasn't been so bad that he's attempted to do anything about it, but it's so bad that you-all should award him $3 million? So that's the damages case.

*Id.* at 2584.

At the conclusion of all the evidence, the district court instructed the jury as follows regarding its determination of compensation for the losses that Fresquez suffered as a result of his termination:

> If you find in favor of the Plaintiff on his retaliation claim, then you must determine an amount that is fair compensation for the Plaintiff's losses. You may award compensatory damages for injuries that the Plaintiff proved by a preponderance of the evidence were caused by the Defendant's wrongful conduct. The damages that you award must be fair compensation, no more and no less.

> In calculating compensatory damages, you should not consider any back pay or front pay that the Plaintiff lost. The award of back pay and front pay, should you find the Defendant liable on the Plaintiff's claim, will be calculated and determined by the Court.

> The Plaintiff claims damages for any emotional distress, pain, suffering, inconvenience, or mental anguish that the Plaintiff experienced as a consequence of his termination by the Defendant. No evidence of monetary value of such intangible things as pain and suffering has been, or need be, introduced into evidence. There is no exact standard for setting the compensation to be awarded for these elements of damages. Any award you make should be fair in light of the evidence presented at trial.

> In determining the amount of any damages you decide to award, you should be guided by common sense. You must use sound judgment in fixing an award of damages, drawing reasonable inferences from the facts in evidence. You may not award damages based on sympathy, speculation, or guesswork. On the other hand, the law does not require that the Plaintiff

63

prove the amount of his losses with mathematical precision, but only with as much definiteness and accuracy as circumstances permit.

*Id.*, Vol. I at 282 (Instruction No. 21).

The jury, after deliberating, found that Fresquez "prove[d] by a preponderance of the evidence that he should be awarded compensatory damages for emotional distress, pain, suffering, inconvenience, or mental anguish," and it awarded Fresquez $800,000 in such damages. *Id*., Vol. I at 295.

In its post-judgment motion for new trial, BNSF argued, in pertinent part, that it was entitled to a new trial or a remittitur on the issue of compensatory damages. BNSF argued that "[t]he jury's award of $800,000 in compensatory damages [wa]s against the weight of the evidence and excessive." *Id*., Vol. III at 720. BNSF noted that "[t]he only evidence in support of the compensatory damages award [wa]s [Fresquez]'s testimony that he: (1) is making less money and finding a new job was really hard on him and his family . . . ; (2) he does not sleep much and has gained a lot of weight . . . ; and (3) he quit coaching competitive youth baseball after he was dismissed because of the stress." *Id*. at 720–21. BNSF noted, however, that Fresquez admitted on cross-examination "that he ha[d] not gone to see a mental health provider for counseling for depression" and "continued to assist with [some baseball] coaching." *Id*. at 721.

In a written order denying BNSF's motion for new trial, the district court specifically addressed the issue of compensatory damages:

> Although BNSF speculates that the jury's verdict "appears to be based on improper arguments of counsel and an intent to punish . . . rather than a

64

reasoned consideration of the evidence" (ECF No. 210 at 17), BNSF offers scant evidence that the jury acted out of passion or prejudice against BNSF instead of based on Fresquez's testimony regarding his non-economic damages. While the Court recognizes that Fresquez did not describe his emotional distress in the most graphic or descriptive terms, he clearly described that the stress from his termination had affected him in significant ways. The events giving rise to this litigation changed who he is as a person by causing him to feel stress about feeding his son, affecting his ability to sleep, causing him to gain weight, and causing him to quit taking part in activities that he loved. The Court will not substitute its own judgment for that of the jury regarding the appropriate amount of compensatory damages, particularly absent any evidence that the jury acted with passion, prejudice, or another improper cause. *See McInerney v. United Air Lines, Inc*., 463 F. App'x 709, 723 (10th Cir. 2011) (affirming $300,000 award for compensatory damages where plaintiff testified that her discharge left her crying for weeks with bouts of depression, caused her to have trouble sleeping, had an effect on her home life and caused her to lose confidence). Because the Court cannot conclude that the jury's award is unsupported by evidence or contrary to reason, BNSF's request . . . that the Court grant judgment as a matter of law or order a new trial as to compensatory damages is denied.

*Id*. at 879–80.

### 3) Analysis

Viewing the evidence presented at trial in the light most favorable to Fresquez, we conclude that the jury could readily have found that: (a) the termination of Fresquez's employment with BNSF caused him severe emotional distress, due both to being terminated under false pretenses and because it forced him to have to search for other available work, all of which offered lower pay and lesser benefits than the position he held with BNSF; (b) the termination of Fresquez's employment with BNSF resulted in Fresquez losing his BNSF-provided health insurance benefits, and in turn caused his son to have to turn to his mother's health insurance policy for coverage for his health

conditions; and (c) the stress that resulted from the termination of his employment caused

Fresquez to gain a significant amount of weight and diminished his overall enjoyment in

the daily activities of life, including coaching his son's baseball team.

To be sure, Fresquez admitted to never having seen a therapist to deal with the

stress caused by his termination, and, in turn, he presented no expert testimony regarding

his emotional distress. Nevertheless, the jury could have decided, consistent with the

closing arguments of Fresquez's counsel, to award Fresquez an amount of damages for

emotional distress that was approximately half of his estimated wage and benefit loss.[12]

As Fresquez's counsel outlined in his closing arguments, this methodology, which BNSF

has never objected to, essentially awarded Fresquez compensatory damages for the

diminishment in the value of his free time that was caused by the stress of his

termination, and the effects of that termination on his income and the well-being of

himself and his son. Ultimately, we cannot say, given all of the evidence that was

presented at trial, that the jury's award was so excessive as to shock the judicial

conscience.

We therefore conclude that the district court did not abuse its discretion in denying

BNSF's motion for new trial on this issue, or in denying BNSF's alternative request for a

---

[12] Although BNSF's counsel objected to Fresquez's counsel's estimate of
Fresquez's wage and benefit loss, they did not otherwise object to the methodology that
Fresquez's counsel proposed the jury use to determine the damages for emotional
distress.

remittitur.  *See Wooten v. BNSF Ry. Co*., 819 F. App'x 483, 487 (9th Cir. 2020) (affirming jury's compensatory damages award of $500,000 for emotional distress to plaintiff in FRSA case who was wrongfully portrayed as liar, and subsequently terminated, by BNSF).  *See also Wooten v. BNSF Ry. Co.,* 387 F. Supp. 1078 (D. Mont. 2019).

D.  *Is BNSF entitled to judgment as a matter of law as to punitive damages?*

In its fifth issue on appeal, BNSF argues that it is entitled to judgment as a matter of law on the issue of punitive damages.  BNSF argues in support that "Fresquez . . . did not prove that BNSF engaged in conduct sufficient to hold the corporation liable for punitive damages."  Aplt. Br. at 48.  BNSF notes that "[t]here is no dispute that Detlefsen and Miller were the employees who made the dismissal decision," and it argues "there [wa]s no evidence whatsoever that Detlefsen or Miller engaged in conduct warranting punitive damages."  *Id*. at 49.

1)  *Standard of review and applicable law*

As we have noted, we review de novo a district court's denial of a motion for judgment as a matter of law, applying the same standards as the district court.  *Bimbo Bakeries*, 29 F.4th at 640.  A court may enter judgment as a matter of law only when the nonmovant has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for the nonmovant on that issue.  *Id*.  In reviewing a district court's denial of a motion for judgment as a matter of law, we draw all reasonable inferences in favor of the nonmoving party, and we will reverse the district court only if

67

the evidence points but one way and is susceptible to no reasonable inferences supporting the nonmovant. *Id*. at 641.

The "Remedies" provision of § 20109 of the FRSA states, in relevant part, that "[r]elief . . . may include punitive damages in an amount not to exceed $250,000." 49 U.S.C. § 20109(e)(3).

### 2) Procedural history of the issue

In his complaint, and later in the final pretrial order, Fresquez alleged that he was seeking punitive damages against BNSF under the FRSA. At trial, Fresquez's counsel asked the jury, during closing arguments, to award Fresquez $250,000 in punitive damages. Fresquez's counsel argued that this amount was "necessary to show BNSF . . . retaliation is not okay" and "enough to get . . . Miller to finally investigate, to go out and look at that defect." Aplt. App., Vol. X at 2556–57. Lastly, Fresquez's counsel told the jury: "And I will have you note, even if you added all of the wage loss that we have requested and the punitive damages, that's less than 10 hours of BNSF's profit, less than they will make today." *Id*. at 2557. BNSF's counsel, in his closing argument, asserted that BNSF had acted in good faith and "ha[d] all the right policies" in place. *Id*. at 2584.

The district court gave the jury the following instruction regarding their determination of punitive damages:

> In addition to the damages mentioned in other instructions, the law permits the jury under certain circumstances to award punitive damages. The purpose of an award of punitive damages is to punish a wrongdoer for misconduct, and also to provide a warning to others.

You may award punitive damages if you find the Plaintiff has proved by a preponderance of the evidence that the Defendant acted with reckless or callous disregard of the Plaintiff's right to be free from retaliation for engaging in a protected activity. The Defendant acted with reckless or callous disregard if the Plaintiff proved by a preponderance of the evidence that the Defendant's employees who made the decision to terminate the Plaintiff's employment knew that the termination was in violation of the law prohibiting retaliation, or acted with reckless or callous disregard of that law.

In deciding the amount of punitive damages, you may consider the following:
1. The offensiveness of the conduct;
2. The amount needed, considering the Defendant's financial condition, to prevent the conduct from being repeated; and
3. Whether the amount of punitive damages bears a reasonable relationship to the actual damages awarded.

However, you may not award punitive damages if the Defendant has proved by a preponderance of the evidence that the retaliatory actions by the Defendant's employees were contrary to the Defendant's good faith efforts to comply with the FRSA by implementing and enforcing policies and programs designed to prevent unlawful retaliation.

*Id.*, Vol. I at 284–85 (Instruction No. 23).

The jury, after deliberating, found that Fresquez had proven by a preponderance of the evidence that BNSF acted with reckless or callous disregard of his right to be free from retaliation for engaging in a protected activity, and it awarded Fresquez $250,000 in punitive damages. *Id*. at 295.

Following the district court's entry of final judgment, BNSF filed a combined motion for new trial and judgment as a matter of law that addressed, in pertinent part, the jury's award of punitive damages. On March 8, 2021, the district court issued a written order denying BNSF's motion. With respect to the issue of punitive damages, the district

court noted that "BNSF [wa]s implicitly asking the Court to view the evidence in [its] favor, instead of Fresquez's favor, . . . notwithstanding certain evidence regarding BNSF's efforts to comply with the FRSA." *Id.*, Vol. III at 881.  The district court noted that "the jury . . . heard testimony that BNSF ha[d] a culture that disregard[ed] railroad safety rules and employee rights." *Id.*  The district court also noted that "even though Detlefsen reviewed the investigatory transcript, which contained Fresquez's complaint that he was being retaliated against, she did little to investigate Fresquez's claim" that Paz was acting illegally and had retaliated against Fresquez for calling out that conduct. *Id.*

   *3)  Analysis*

   BNSF argues in its appeal "that Detlefsen and Miller were the employees who made the dismissal decision," and that "there is no evidence whatsoever that Detlefsen or Miller engaged in conduct warranting punitive damages." Aplt. Br. at 49.  BNSF also argues that, even if there was a work culture in place in Denver that disregarded safety rules and employee rights, "such evidence would not in any event support the punitive damages award." *Id.* at 50.

   We reject BNSF's arguments.  Although BNSF repeatedly asserts that Detlefsen and Miller were the decisionmakers in this case, the jury could have reasonably found, as we have already explained, that the entire charge and investigatory process was effectively guided and controlled by Carpenter and Paz.  This began with the precise BNSF policy provision that Carpenter and Paz decided to charge Fresquez with violating,

70

i.e., a violation that, if proven, automatically resulted in the termination of Fresquez's employment, and in turn the manner in which they presented evidence at the hearing on the charge. The jury could have reasonably found that Paz repeatedly lied during that hearing, and that Detlefsen and Miller in turn relied on that false testimony in making their decision to terminate Fresquez's employment. Relatedly, the jury could have reasonably found that Detlefsen has always upheld charges leveled by BNSF management and never found in favor of a union employee. We also agree with the district court that the jury could reasonably have found that Carpenter and Paz created and promoted a workplace culture that encouraged the flouting of federal safety regulations, and openly discouraged employees, by way of intimidation and fear of reprisal, from objecting to these practices, all for the purpose of allowing trains to continue to run on tracks that contained defects. Notably, the evidence presented at trial by Fresquez also would have allowed the jury to reasonably find that taking tracks out of service reduces a railroad's profits, and that, because of that, BNSF's managers were effectively motivated to misreport or underreport track defects. Finally, the jury could have reasonably found, based upon the evidence presented by Fresquez, that in 2016 BNSF earned a profit of approximately $4 billion dollars. In light of all of this evidence, we have little trouble concluding that there was a legally sufficient evidentiary basis for the jury in Fresquez's case to find for Fresquez on the issue of punitive damages, and in turn to award him the statutory maximum amount of punitive damages.

71

*E. Did the district court err in awarding Fresquez ten years' worth of front pay?*

In its final issue on appeal, BNSF argues that the district court abused its discretion by awarding Fresquez ten years' worth of front pay. In support, BNSF makes two distinct arguments. First, BNSF argues that the "front pay" that the district court purported to award Fresquez was "actually a damages judgment for loss of future earning capacity." Aplt. Br. at 51. Second, BNSF argues that the district court awarded an amount of front pay that was larger than the court's equitable jurisdiction and the record permitted.

*1) Standard of review*

Where, as here, a district court awards front pay as an equitable remedy in an action filed under an applicable federal law, we review the district court's award for abuse of discretion. *See Tudor*, 13 F.4th at 1040 (reviewing front pay award in action brought by former professor against state university under Title VII); *Hayes v. SkyWest Airlines, Inc.*, 12 F.4th 1186, 1204 (10th Cir. 2021) (reviewing front pay award in action brought by former employee against employer under the Family and Medical Leave Act and Americans with Disabilities Act); *Whittington v. Nordam Grp., Inc.*, 429 F.3d 986, 1001 (10th Cir. 2005) (reviewing front pay award in action brought by former employee against employer under the Age Discrimination in Employment Act). "The district court's discretion encompasses both whether to award front pay and the amount of the award." *Hayes*, 12 F.4th at 1204. "Because determining a front pay award requires the district court to predict future events and consider many complicated and interlocking

72

factors, we review such awards with considerable deference." *Whittington*, 429 F.3d at 1001 (quotation marks omitted).

### 2) Procedural history of the issue

Fresquez, in his complaint, sought "reinstate[ment] . . . to the same position he held when he was terminated," as well as "such other relief as the Court deems just and equitable." Aplt. App., Vol. I at 30–31. In the final pretrial order, Fresquez modified his request slightly, stating that he was entitled to "reinstatement with the at-issue discipline expunged and the seniority he would have had but for the at-issue discipline" or, alternatively, "if the [district court] determines that reinstatement is impractical, which Fresquez believes is the case, front pay in lieu in an amount to be recommended by the jury and decided by the [c]ourt." *Id*. at 68.

Prior to trial, the district court determined that the issues of back pay and front pay were equitable remedies to be decided by the court. Consequently, at trial, the jury was not asked to determine back pay or front pay. After the jury returned its verdict, the district court encouraged the parties to attempt to reach an agreement on the issues of back pay and front pay and, if necessary, to request a hearing on those issues. The parties, however, were unable to reach an agreement on those issues.

As a result of this impasse, Fresquez moved for an award of back pay and front pay. Fresquez asked for "an award of backpay in the amount of $183,821, with interest, and frontpay in the amount of $1,338,706, with interest, for a combined total award for lost wages and benefits in the amount of $1,522,527, with interest." *Id*., Vol. II at 305.

73

BNSF responded to Fresquez's motion and asked that his "wage loss instead be limited to the difference between what he would have made at BNSF based on his actual wages and what he could have made with reasonable efforts to mitigate his damages for a reasonable period following his termination." *Id*. at 384.

The district court held a hearing on the issues of back pay and front pay. Fresquez testified and also presented testimony from his expert witness, Jeffrey Opp, regarding proposed calculations for the back pay and front pay. BNSF presented testimony from a vocational expert, Cynthia Bartmann, regarding Fresquez's employability, estimated wages, and how long it should have taken Fresquez to find work following the termination of his employment with BNSF.

On November 4, 2019, the district court issued an order granting in part, denying in part, and taking under advisement in part, Fresquez's motion for back pay and front pay. The district court concluded that "granting front pay until 2045 [when Fresquez would reach the retirement age of 60] would surely result in a windfall to Fresquez," but it also "conclude[d] that granting front pay for only two or three years would result in an unwarranted and unmerited windfall to BNSF." *Id*. at 438. The district court thus concluded that, "[g]iven [Fresquez's] intent to stay with the company for the long term, but also factoring in his youth, his opportunities for a significant, if not comparable, wage and benefits package as a building inspector, as well as his disciplinary history," that he "would likely have remained at BNSF for an additional ten years." *Id*. at 438–39. The district court therefore "f[ound] that Fresquez [wa]s entitled to ten years of front pay from

74

the date of the jury verdict." *Id*. at 439.  The district court rejected BNSF's argument that

Fresquez failed to make reasonable efforts to mitigate his damages.  The district court

also rejected BNSF's argument that the court was limited to "simply determin[ing] the

length of the front pay period" and lacked authority to "award a specific dollar amount

for front pay." *Id*. at 445–46.  The district court ordered the parties "to submit

simultaneous supplemental briefing . . . on the issue of the correct amount of back pay

and front pay to be awarded to Fresquez." *Id*. at 446.  In doing so, the district court

"instructed the parties to not reduce Fresquez's back pay by the amount Fresquez

received in unemployment benefits," "to omit any health insurance payments from the

back pay calculation for failure to prove the amount spent due to lack of health

insurance," "to calculate Fresquez's estimated but-for wages using the method of expert

witness Jeffrey Opp," "to calculate the relative loss in health benefits using a multiplier,"

and to "include prejudgment interest using a fixed rate of 5.54%, compounded monthly

and according to a formula approved by the Tenth Circuit." *Id*., Vol. III at 666 (footnote

omitted).

On December 17, 2019, the district court issued an order awarding Fresquez "a

total tax-adjusted award of back pay, front pay, and prejudgment interest through

December 17, 2019 of $696,173." *Id.* at 681 (emphasis omitted).

3) *Failure to distinguish between front pay and damages for loss of future earnings capacity*

BNSF begins its challenge to the district court's front pay award by arguing that the district court committed an error of law when it failed to distinguish between front pay and damages for loss of future earnings capacity. According to BNSF, the district court's award was actually for loss of future earnings capacity rather than front pay in lieu of reinstatement.

We recently held, in the context of a Title VII case, that damages for lost future earnings are economic rather than equitable in nature. *See Jensen v. West Jordan City*, 968 F.3d 1187, 1199–1200 (10th Cir. 2020).[13] Notably, however, we have never addressed the difference between front pay in lieu of reinstatement and damages for loss of future earnings capacity.

An excellent discussion of this difference is contained in the Seventh Circuit's decision in *Williams v. Pharmacia, Inc.*, 137 F.3d 944, 953 (7th Cir. 1998). In that case, the Seventh Circuit reviewed a district "court's decision to award both front pay and . . . lost future earnings as damages" to a plaintiff who had alleged under Title VII and the Equal Pay Act that defendant, her former employer, had "refused to promote her" "on the basis of her sex" and subsequently "fired her after she complained that the company paid

---

[13] In *Jensen*, the plaintiff, a former police officer, effectively claimed reputational damage caused by defendants wrongfully prosecuting him for criminal activity, and he asserted that this reputational damage would prevent him from ever obtaining another position as a police officer.

men in her position more than it paid women." *Id*. at 946. The defendant-employer argued on appeal "that the front pay award and the lost future earnings award [we]re duplicative and therefore overcompensatory." *Id*. at 953. In addressing and rejecting this argument, the Seventh Circuit noted that "the two awards compensate the plaintiff for different injuries." *Id*. "Front pay," the Seventh Circuit noted, "compensated [plaintiff] for the immediate effects of [defendant's] unlawful termination of her employment" and "approximated the benefit [plaintiff] would have received had she been able to return to her old job." *Id*. The Seventh Circuit in turn noted that "[t]he lost future earnings award, in contrast, compensate[d] [plaintiff] for a lifetime of diminished earnings resulting from the reputational harms she suffered as a result of [defendant's] discrimination." *Id*. Thus, the Seventh Circuit noted, "[e]ven if reinstatement had been feasible in this case, [plaintiff] would still have been entitled to compensation for her lost future earnings." *Id*. The court explained that "[a] reinstated employee whose reputation and future prospects have been damaged may be effectively locked in to his or her current employer" and "cannot change jobs readily to pursue higher wages and is more likely to remain unemployed if the current employer goes out of business or subsequently terminates the employee for legitimate reasons." *Id*. "These effects of discrimination," the court noted, "diminish the employee's lifetime expected earnings." *Id*. The Seventh Circuit therefore held that "there [wa]s no overlap between the lost future earnings award and the front pay award." *Id*.

Applying these definitions to the facts of our case, it is apparent that Fresquez has never sought, and the district court did not award him, damages for loss of future earnings capacity. As previously discussed, Fresquez's complaint requested reinstatement to his position with BNSF, and he persisted with that request through the time of trial. Once it became apparent that reinstatement was not possible, however, Fresquez then moved for an award of front pay in lieu of reinstatement. Notably, Fresquez has never alleged nor attempted to prove that BNSF's retaliatory conduct in discharging him from his employment damaged his reputation or future prospects of employment with other employers, as would be necessary for him to obtain a damages award for loss of future earnings capacity.

Most importantly, the district court's front pay award is entirely consistent with the definitions outlined by the Seventh Circuit in *Williams*. The district court's award compensated Fresquez "for the immediate effects of [BNSF's] unlawful termination of [his] employment" and "approximated the benefit [Fresquez] would have received had [he] been able to return to [his] old job." *Id*. Although BNSF complains that Opp referred in his report to "future lost earnings," Aplt. App., Vol. II at 388, Opp's calculations in that regard were based upon the differences between the amounts Fresquez would have earned had he been reinstated to his position at BNSF and the amounts that Opp calculated Fresquez could have earned in a non-BNSF position. Notably, it appears to be undisputed that Fresquez's earning potential at BNSF was higher than at any other non-BNSF position he could reasonably obtain. Indeed, because

78

BNSF is a unique employer, Fresquez's BNSF position and the skills he gained while working in that position cannot be replicated outside of BNSF. Therefore, Fresquez was left to find analogous positions with non-railroad employers, and he ended up taking positions as a building inspector.

Thus, in sum, the district court correctly awarded Fresquez front pay in lieu of reinstatement and did not, as BNSF suggests, actually award him damages for loss of future earnings capacity.

### 4) The amount of the front pay award

As part of its challenge to the district court's award of front pay, BNSF also argues that the district court abused its discretion by awarding an amount of front pay larger than the district court's equitable jurisdiction and the record permitted. Focusing first on what it describes as the district court's equitable jurisdiction, BNSF asserts that there is a traditional limitation on equity practice that prohibits enforcement of what amounts to a penalty. BNSF in turn argues that "[t]he front pay award here is 'in the nature of a penalty.'" Aplt. Br. at 63. BNSF asserts that "[a]n employer makes no 'profit' from discharging an employee, who usually must be replaced, meaning that an award of wages to the discharged employee requires the employer effectively to pay double for one employee's services." *Id*. BNSF further argues that "[t]he reasons given by the district court to justify ten years of front pay instead amount to punishing BNSF for being a good employer that pays good wages, provides valuable benefits, teaches useful skills, and offers good working conditions, including comparative job security, providing valued

employment in communities where equivalent work is hard to come by." *Id*. "Those circumstances," BNSF argues, "are not 'individualized' to Fresquez" and instead "describe the experiences of the vast majority of BNSF's over 42,000 employees." *Id*. at 64. "Awarding front pay on the basis adopted by the district court," BNSF argues, i.e., "the desirable working conditions . . . BNSF offers[,] thus penalizes the company for being a good employer, contrary to one of the absolute prohibitions of 'traditional equity practice.'" *Id*. In sum, BNSF argues that "[t]he front pay award to Fresquez was an 'instrument of punishment'" because "it calibrated the payment amount to the attractiveness of the economic terms and conditions of employment offered by BNSF." *Id*. at 65.

We reject BNSF's arguments. The record on appeal makes quite clear that the district court's front pay award to Fresquez was not intended to penalize BNSF for its conduct (the jury's punitive damages award covered that objective), but rather to compensate Fresquez for the immediate effects of BNSF's unlawful termination of his employment by approximating the salary and benefits Fresquez would have received had he been reinstated and then worked for BNSF for approximately ten years. Although BNSF complains that the district court effectively punished it for the "desirable working conditions" and benefits that it offers to all of its employees, the record refutes that point. Aplt. Br. at 64. The record, to be sure, confirms that the wages and benefits paid by BNSF to its employees in the Denver area are higher than analogous non-railroad positions available to those employees. That higher pay, however, appears to be

attributable, in part, to the fact that BNSF's non-management employees are union members who benefit from a collective bargaining agreement between BNSF and their union. The record on appeal also establishes that BNSF earned a profit of approximately $4 billion dollars in 2016 and, based at least in part on those profits, made a reasoned and reasonable decision regarding how much to pay its union employees.

BNSF also fails to mention that the Ninth Circuit recently affirmed a similar, yet more substantial front pay award to another BNSF employee who was wrongfully terminated in retaliation for reporting a work-related injury. In that case, the plaintiff, who like Fresquez presented expert testimony from Opps, was awarded "$1,407,978 for lost wages and benefits in the future, reduced to present value . . . , for BNSF's violation of the FRSA." *Wooten v. BNSF Ry. Co.*, 387 F. Supp. 3d 1078, 1100 (D. Mont. 2019), *aff'd*, 819 F. App'x 483 (9th Cir. 2020). Unlike in Fresquez's case, the award in *Wooten* was intended to cover the remainder of the plaintiff's career. *Id.* at 1102 (noting that Wooten expressed an "intent of working for BNSF until retiring between the ages of 60 and 67"). The district court noted in support of the front pay award that "BNSF is one of the best-paying jobs available to individuals with limited education in Kalispell, Montana, and Wooten loved the job and had ambitions within the company." *Id.* Although BNSF argued on appeal that the district court abused its discretion in awarding the plaintiff front pay, the Ninth Circuit rejected that argument:

> Upon careful review, we conclude that the front pay award, although for an extended period, does not constitute an abuse of discretion based on the highly unusual, fact specific record before the court. Wooten had a

81

limited education and was from a small railroad town. He came from a railroad family—his grandfather retired from the railroad—and worked at one of the best paying jobs in the area. Notably, Wooten acquired at BNSF a specific set of skills that were related only to the transportation industry. After being dismissed in violation of the FRSA, Wooten was faced with an essentially non-existent job market for comparable paying jobs.

Indeed, BNSF's own expert confirmed that the job market was highly unusual. The company's vocational expert testified that Wooten had a highly specialized set of skills derived from his work at BNSF; that the most he could make working at another railroad would be $60,000 (compared to the approximately $100,000 he had been making at BNSF); that it was unclear whether another railroad would even be willing to hire him; and that his insurance job was probably the best-paying job he could otherwise hope to get. What's more, it appears that the seniority Wooten had acquired at BNSF ensured that he would actually get put on jobs with that employer, while his lack of seniority at any other railroad might have rendered him unable to earn a full-time salary. BNSF did not show that Wooten would be able to find a comparable job at any point over his expected working career. Moreover, given the salary Wooten earned at BNSF and the benefits associated with the seniority that he enjoyed, Wooten would not have had any economically rational reason to ever leave BNSF, making it far from speculative to find that he would have stayed at the company until his retirement.

In the vast majority of cases, a plaintiff will be able to find a comparable job within a few years, and for that reason, only a few years of front pay will be sufficient to bridge the gap in earnings. But this is not a typical situation. The district court's findings supporting the front pay award were not clearly erroneous, and the award was not an abuse of discretion.

*Wooten*, 819 F. App'x at 487. In our view, essentially the same analysis applies to

Fresquez's case.

BNSF also argues that the district court abused its discretion in setting the end date

for the front pay award because, although the district court correctly "stated the standard

for ending front-pay eligibility as the plaintiff finding a job 'comparable or superior' to

the former employment, its analysis shows that in the court's view only another railroad

job could qualify." Aplt. Br. at 67 (citation omitted). Further, BNSF argues that the district court "erred by treating it as established that Fresquez could never work again in railroading." *Id*. BNSF argues, however, that Fresquez's own actions and testimony establish that he made no efforts to obtain another railroad job and, instead, "considered the three building-inspector jobs he obtained 'substantially equivalent' to or even preferable . . . to returning to railroad work." *Id*. at 68. Thus, BNSF argues, "[t]he district court therefore abused its discretion by finding that the proper end date of the front-pay award to Fresquez extended far beyond the date on which he took what was *to him* 'substantially equivalent' employment." *Id*. at 69.

BNSF failed, however, to present this same argument to the district court. In its response to Fresquez's motion for back and front pay, BNSF argued, in pertinent part, that Fresquez had failed to make sufficient efforts to find other employment and thus remained unemployed for certain periods of time between May 2016 and October 2017. According to BNSF, Fresquez "should have been able to find full-time work in his chosen field of building inspection within one to two months of his termination," and that the "median wage for construction and building inspection in the Denver metropolitan area [was] $66,410." Aplt. App., Vol. II at 386. But BNSF did not argue in that response, as it does now in its appeal, that Fresquez considered building inspection positions to be substantially equivalent employment and, for that reason, that no front pay should be awarded. We therefore conclude that BNSF has waived this argument. *See*

83

*Little v. Budd Co.*, 955 F.3d 816, 821 (10th Cir. 2020) ("[A]bsent extraordinary

circumstances, arguments raised for the first time on appeal are waived").

## IV.  *Affirmance of judgment of district court*

The judgment of the district court is AFFIRMED.